# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>FILE STORAGE PARTNERS, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11 (Subchapter V)<br><br>Case No. 23-10877 (CTG)<br><br>(Joint Administration Requested) |

## DECLARATION OF TIMOTHY FUREY, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Timothy Furey, hereby declare under penalty of perjury:

1. I am the appointed Chief Restructuring Officer for File Storage Partners LLC ("FSP"), Afton Blockchain LLC ("Afton"), Filtech SPV LLC ("Filtech"), and Midwest Blockchain, Inc. ("Midwest," and together with Afton and Filtech, the "Subsidiary Debtors") and the Subsidiary Debtors together with FSP, the "Debtors"). In my capacity as Chief Restructuring Officer of the Debtors, I am familiar with the Debtors' day-to-day operations, books and records, business, and financial affairs.

2. I submit this Declaration in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and motions filed on the date hereof seeking various types of "first day" relief and to provide an overview of the Debtors' business and their need for protection under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. Except as otherwise indicated, all facts in this Declaration are based upon my

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842). The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

personal knowledge, my discussions with the Debtors' management team and advisors, including Bayard P.A., my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and/or my opinions based upon my experience and knowledge. I am over the age of 18 years and duly authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

4. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings (collectively, the "First Day Motions"). I am authorized by the Debtors to submit this Declaration on their behalf in support of the First Day Motions.

5. The First Day Motions are intended to enable the Debtors to operate effectively and efficiently within these chapter 11 cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of these cases. Among other things, the First Day Motions are designed to meet the Debtors' goals of: (i) continuing their operations in chapter 11 with as little disruption and loss of productivity and value as possible; (ii) maintaining the confidence and support of their customers, employees, vendors and service providers; and (iii) establishing procedures for the smooth and efficient administration of these chapter 11 cases. I have reviewed the First Day Motions, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' business, and (b) maximize and preserve the value of the Debtors' chapter 11 estates. As set forth in greater detail below, certain affiliates of the Debtors have not commenced bankruptcy proceedings because it would be inefficient to do so and would result in less recovery to affected creditors who have any prospect of recovery.

6.  This Declaration provides an overview of the Debtors' business, capital structure, the proposed debtor-in-possession ("DIP") financing, and the circumstances giving rise to the commencement of these chapter 11 cases, and summarizes the relief requested in each of the First Day Motions.

I. **OVERVIEW**

   A. **Background**[2]

7.  The Debtors' history began with a non-Debtor entity known as DLTx ASA ("ASA"). ASA was the first publicly-traded company (Oslo Børs: DLTX) to monetize token rewards produced by building out the infrastructure of public, permissionless blockchains (often referred to as "mining"). ASA was the result of the reverse merger of a set of shares in blockchain and Bitcoin mining companies into a publicly-traded company on the Norwegian national stock exchange. ASA expanded by taking in investor funds through special purpose vehicles ("SPVs", with investors in the same hereafter "Subordinated SPV Investors") to fund projects in blockchain-related industries, which funds were then invested in capital goods (primarily computing hardware) and operations (payroll, electricity, general corporate purposes). The profits earned through the utilization of this equipment and expertise were then intended to be split between the Subordinated SPV Investors and ASA.

8.  As part of ASA's expansion, in March 2021, ASA acquired non-Debtor DSM Tech Enterprises Inc. ("DSM", and the acquisition thereof, the "DSM Acquisition"), a technical services provider which allowed ASA to become a fully integrated technology company. Given DSM's experience, ASA began focusing on a blockchain protocol called Filecoin.[3] As part of the DSM

---

[2] The summary of the loan documents and security agreements set forth herein is qualified in its entirety by the documents themselves. To the extent there is a discrepancy between the descriptions set forth herein and the documents, the documents control.

[3] The Filecoin network is described more fully below.

3

Acquisition, ASA also acquired DSM's existing Filecoin data storage operations maintained by the Subsidiary Debtors, which entities were wholly owned by DSM.

9. Under the DSM's operations, DSM served as the operating company that held the equipment, the vendor relationships, and actually performed the data storage operations as a service provider to the Subsidiary Debtors, as well as FSP. The Subsidiary Debtors, as well as FSP, paid DSM for use of a data center and management fees to cover DSM's operating expenses. At the time of DSM's purchase by ASA, the Subsidiary Debtors were wholly owned by DSM.

10. The Filecoin network itself is a decentralized cloud storage platform, similar to Amazon Web Services, iCloud, and Microsoft Azure. Companies, governments, and individuals can store data on the Filecoin network as with any other "centralized" cloud platform. The Filecoin network's competitive advantage is reduced cost and reduced risk of not having to rely on a centralized provider. Currently, Filecoin has 1% of the global cloud storage market. Operators in the Filecoin ecosystem are compensated for their services (described in more detail below) by payments from the protocol in the form of Filecoin tokens—a type of cryptocurrency commonly known as "FIL." These payments are called rewards.

11. The Filecoin network is "trustless" in that it creates incentives for "good" behavior. In order to participate, participants must deposit or "stake" Filecoin tokens to the network. These tokens can then be repossessed or "slashed" by the Filecoin network if the miners act inappropriately, thus creating an incentive structure for good behavior. Such inappropriate behavior may include turning off machines or disconnecting storage. This protects the network and those who rely on it from hacks, as well as encourages sound operations by storage providers. In return, the Filecoin network rewards miners with FIL tokens for the storage they provide. The FIL received can then be redeployed back into the network or sold on one of the numerous digital

asset exchanges. Germane to these cases, the secondary market for FIL has dropped precipitously since ASA's operations commenced, dropping from a high of ~$21/FIL around the time of the DSM Acquisition to ~$3/FIL as of the beginning of 2023.[4] This significantly deteriorated the financial health of ASA's Filecoin operations.

12. Despite this decreasing pricing, ASA became one of the largest FIL staking operations in North America. It achieved this success through efficient technical performance and pioneering new ways to procure the FIL needed to expand storage operations. Instead of spending cash on the open market to buy FIL, ASA borrowed FIL; in particular, ASA developed low-cost collateral borrowing methods pursuant to which it borrowed the FIL held by institutions and high net worth individuals while providing them comfort that their tokens were safe. By borrowing and repaying the loans (plus interest) in FIL, ASA sought to insulate itself from market fluctuations in the dollar price of the token.

13. Notwithstanding, ASA proved unable to weather the combined effect of FIL's collapsing price and the macroeconomic shocks that swept through the cryptocurrency industry in recent years—namely, the fall of industry giants FTX, the Terra network, Three Arrows Capital, and the contagion this created among institutions. Certain entities that ASA relied on for borrowing FIL, such as Genesis Global, were likewise forced into bankruptcy.

14. Additionally, ASA suffered from liquidity issues as a result of exorbitant data center costs and a ballooning payroll. The former cost approximately $2.7 million per year (against a run rate of approximately $1.1 million of annual revenue by the end of 2022). ASA was also supporting annual payroll of approximately $2.5 million, $1 million of which was dedicated to the FIL operations. Taken as a whole, ASA's ability to cover operating expenses collapsed by

---

[4] As of the time of this filing, the price of FIL trades at approximately $4 USD.

December 2022.

15. As financial trouble began to surface in the summer of 2022, ASA entered into a merger with a SPAC, Blockchain Moon Acquisition Corp. ("BMAQ") in September 2022. The SPAC merger promised $10 million in fresh capital and a listing on the NASDAQ. Unfortunately, in February 2023, both parties mutually agreed to terminate the SPAC as it became evident that BMAQ was unable to raise the funds for the transaction. This left ASA in a precarious financial position and without a breakup fee to utilize in the short term.

16. By the close of 2022, ASA became unable to pay its data center and other costs and began cutting salaries and reducing or deferring expenses. Senior staff began deferring all compensation as of January 2023 and only operational staff and engineers received salaries. Compounding these woes, in Q1 2023, Norwegian auditors became concerned at the financial condition of ASA's Filecoin operations based on their perception that ASA owed approximately $25 million to the Filecoin-related SPVs.[5] While certain management disagreed over whether these were revenue sharing arrangements which could not create a default, by April 8th, 2023, Norwegian management had threatened to shutter ASA's Filecoin division, leaving the non-Norwegian stakeholders in the operations with no apparent path to protecting their rights vis-a-vis ASA. Accordingly, in pursuit of a better outcome for the non-Norwegian stakeholders of the Filecoin Business (defined below), James Haft, the former non-executive chairman of ASA, and two officers of ASA, David Johnston and Jacob Farber, formed a new entity—later known as DLTx, LLC—which entered into a spinoff transaction by which the new company would assume ownership of the entities (including the Debtors here) associated with ASA's Filecoin operations (collectively, the "Filecoin Business"). Through the spinoff, it was hoped that ASA's previous

---

[5] It was at best unclear whether ASA had any obligation whatever on the SPV debt, and further unclear whether any amounts were owing by even the SPVs due to the specific contractual triggers for repayment of the investments.

Filecoin Business could continue servicing its employees, investors and vendors. An organizational chart of the post-spinoff entities is attached hereto as Exhibit A.

### B. Events Leading to Bankruptcy

17. As a result of the spinoff, DLTx LLC ("NewDLTx")[6] became the sole owner of all the operating entities of the Filecoin Business, including (indirectly) the Debtors.[7] At the time, the divested Filecoin Business was encumbered by $33 million in debt with approximately $16 million in book value book-value assets and $120,000 monthly revenue, with a monthly burn rate of ~$550,000. Presently, as to the Debtors, their debt structures are as follows:

   a. *FSP*: more than $13 million in total book value of assets, comprised of loans, Filecoin held as collateral, Filecoin used in ongoing data center operations, and Filecoin stored within Wallets, and most importantly, its data center equipment. The equipment is operated and serviced by DSM pursuant to the service agreement between the two parties, and currently resides on the premises of Lightedge Solutions, Inc. ("Lightedge"),[8] a data center provider. FSP's liabilities, totaling approximately $31 million[9] are largely comprised of (i) intercompany claims related to a variety of unsecured loans issued by certain of its SPV subsidiaries (the "Non-Debtor SPVs"), (ii) amounts owed under those certain *Master Loan and Security Agreements* with lenders who lent FSP certain digital currencies, and (iii) amounts due under certain equipment agreements.

   b. *Filtech*: Filtech's assets are comprised of approximately $358,927 in data center equipment (prior to depreciation). Its liabilities, totaling nearly $300,000, are comprised of accounts payable and certain intercompany loans.

   c. *Midwest*: Midwest's assets are comprised of approximately $75,000 in data center equipment. Its liabilities, totaling nearly $200,000, are comprised of accounts payable and certain intercompany loans.

   d. *Afton*: Afton's assets are comprised of approximately $275,000 in data center equipment and intercompany loans. Its liabilities, totaling nearly $25,000, are

---

[6] The spinoff transactional documents are in the names of ASA and "NewBuyer LLC"—NewBuyer LLC later changed its name to "DLTx, LLC.".

[7] As reflected in Exhibit A, FSP is the wholly-owned subsidiary of non-Debtor File Storage Company 1, Inc., which in turn is wholly owned by NewDLTx non-Debtor subsidiary, Distributed Ledger Technologies Ireland Limited, an Irish company.

[8] Out of an abundance of caution, the Debtors issued a letter to Lightedge advising them of the automatic stay's applicability with respect to the Debtors' equipment on its premises.

[9] When reduced for insider debts, this amount falls well under the $7.5 million noncontingent liabilities Subchapter V cap.

comprised of certain accounts payable.

18. FSP intended to solve its financial crisis by restructuring the debt held by the Subordinated SPV Investors by offering the opportunity to exchange their debt obligations for equity in FSP. The premise of the plan was that by eliminating debt, the Filecoin Business could raise the additional capital needed to continue the business. Unfortunately, FSP was never able to achieve near the 100% consent that would have been required to equitize the Subordinated SPV Investors' debt.

19. In light of the failure of the debt-for-equity swap, both the Debtors and their non-Debtor affiliates were forced to make additional efforts to right-size their financials. Among other things, these efforts lead to a reduced headcount by over 50%, more streamlined operations, and reduced costs while maintaining operations to the best extent possible.

20. In addition to operational changes, the Debtors, in conjunction with the broader efforts of NewDLTx, explored other ways to leverage FIL production and assets (primarily computer hardware), to raise the short-term capital needed to meet operational needs. Strategies employed to fund the operations included selling their FIL production forward as derivative instruments, raising equity, issuing debt, and exploring joint venture possibilities with existing and new investors and partners. As to the Debtors' lender outreach, the approximately five (5) institutions with which the Filecoin Business management team spoke were unwilling to take uncollateralized counterparty risk against the Debtors and there was no other cash or digital assets available to sell or leverage. Similarly, the efforts to sell, lever or otherwise monetize the computing hardware were unsuccessful, as lenders were not interested in collateralized loans where the liquidated market value of the hardware was estimated to be less than $3 million.

21. A further decline in FIL prices and the bloated legacy vendor contracts left the

Debtors with no option but to further restructure its obligations. Indeed, while the Debtors have had continual dialogue with their vendors, the largest two vendors (the data centers and a hardware vendor) have not shown a willingness to restructure their positions vis-à-vis the company. Thus, the Debtors were forced to cut all salaries (which salaries are paid and handled through non-Debtor affiliate DSM) other than the limited critical staff that presently remains and seek a sale of all their assets in the context of a Subchapter V Chapter 11 case.

22. At this stage, FSP reached out to several investors of last resort and identified Silvermine Capital Advisors' LLC ("Silvermine"), a consulting and investment firm with extensive experience in technology company capitalizations and restructurings, including (significantly) digital asset infrastructure and mining operations. This experience includes investments in companies with operations similar to the Debtors, which positioned Silvermine to be a valuable resource to the Debtors on account of Silvermine's familiarity with the Debtors' business (and NewDLTx as a whole) and the unique challenges it faced.

23. The purpose of Debtors' principals' discussions was to solicit Silvermine's interest in capitalizing or otherwise facilitating a restructuring of the Debtors' operations in conjunction with a restructuring of NewDLTx's operations as a whole. Through its portfolio operations, Silvermine has the technical expertise and personnel to fully support the Debtors' existing operations with limited risk of the downtime that would otherwise result in slashing events, potentially resulting in the total loss of secured lender collateral over a very short period.

24. Toward that end, Silvermine structured a special purpose vehicle to fund the Debtors' chapter 11 cases and acquire the Debtors' assets via a credit bid of the DIP Facility obligations in order to ensure continuous operation as a going concern. Given (a) the absence of other viable liquidity, operational or restructuring options, (b) the absence of any other entities

showing interest in financing these cases or acquiring the Debtors' assets (in part due to the difficulty in locating parties that understand the Debtors' assets and business model in the first place), and (c) the looming threats being issued by the Debtors' data center providers, the Debtors strongly believe that a sale of its assets to Silvermine is the best possible option for the companies and their estates, especially in the context of a broader restructuring occurring outside of this Court (which Silvermine has likewise agreed to facilitate). As such, this is correspondingly the best chance for the Filecoin Business to realize its full potential.

## II. FIRST DAY MOTIONS[10]

### A. Debtors' Motion for Entry of Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief (The "Joint Administration Motion")

25. Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing joint administration of these chapter 11 cases for procedural purposes only and (b) granting related relief. Given the integrated nature of the Debtors' operations, I believe joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of parties in interest.

26. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, I respectfully request that the Joint Administration Motion be approved.

### B. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Continue to use Existing Business Forms, and (C) Continue Certain Intercompany Transactions and (II) Granting Limited Relief From The Requirements of Bankruptcy Code Section 345(b) (the "Cash Management

---

[10] Capitalized terms used in this section, but not defined, have the meaning ascribed in the respective First Day Motion.

**Motion")**

27. By the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors, in their discretion, to (a) continue to operate their Cash Management System (as defined below), including the authority to pay routine prepetition banking fees, (b) continue to use existing Business Forms, (c) continue to perform Intercompany Transactions (as defined below) consistent with historical practice and pay certain prepetition obligations related thereto and (ii) granting limited relief from the requirements of Bankruptcy Code section 345(b).

28. The Debtors operate an integrated system of Accounts (as defined below) to facilitate the collection and disbursement of funds across their Debtor and non-Debtor affiliate entities (the "Cash Management System"). Further, the Cash Management System enables monitoring of collection and disbursement activity and facilitates the Debtors' reporting through the development of timely and accurate information.

29. The Debtors maintain daily oversight over the Cash Management System and implement cash management control protocols for entering, processing, and releasing funds. Additionally, the Debtors' accounting department reconciles the Debtors' books and records on a monthly basis to ensure that all transfers are accounted for properly.

30. As of the Petition Date, the Cash Management System includes three ordinary deposit bank accounts held by the Debtors (the "Deposit Accounts"), which have no balances. One of the Deposit Accounts is held by the Debtor File Storage Partners, LLC ("FSP") at PlainsCapital Bank and two of the Deposit Accounts are held by the Debtor Afton Blockchain LLC at Evolve Bank & Trust ("Evolve").

31. FSP also maintains an account to hold, trade, and convert its FIL cryptocurrency to U.S. dollars (the "FIL Account," and together with the Deposit Accounts, the "Accounts"), which

cash is then remitted on to FSP's Deposit Account. Sequentially, the FIL is generated by FSP's staking equipment and is maintained there prior to being sent to the FIL Account for liquidation. The FIL Account is held at the cryptocurrency platform, Anchorage Digital ("Anchorage," and together with Evolve and PlainsCapital Bank, the "Banks"). While the FIL Account is in the name of the Debtor FSP and will maintain FSP's FIL, it is nested under an account at Anchorage that is held by FSP's non-debtor subsidiary, File Storage Ops 1 LLC. As part of the Debtors' historical practice, at times, the conversion of FSP's FIL to U.S. dollars would occur at the File Storage Ops 1 level, with the resulting liquidated cash remitted to FSP's Deposit Account.[11] As of the Petition Date, the FIL Account had a balance of 3,726 FIL, which is worth approximately $14,500 based on the valuation of the FIL token at the time of this Motion. In addition, the Debtors' affiliates maintain eleven bank accounts. Of those accounts, only an account for the Debtors' affiliate DSM Tech Enterprises, Inc. ("DSM") maintains funds, which amount to approximately $2,500. The Debtors incur certain fees and charges in connection with the ordinary course of operations (collectively, the "Bank Fees"). The process through which the Debtors receive payments, make cash disbursements, and transfer funds between the bank accounts is described in greater detail in the Cash Management Motion and Exhibit C attached to the Cash Management Motion.

32. I believe that the Debtors' transition into chapter 11 will be significantly less disruptive if the Accounts are maintained following the commencement of these cases with the same account numbers and, where applicable, automated relationships. I further believe that it is imperative for the Debtors to be able to deposit funds or cryptocurrency in and withdraw (or as to cryptocurrency, convert to U.S. dollars) funds from the Accounts, subject to the same access rights and limitations existing prior to the Petition Date, including but not limited to checks, wire

---

[11] For the avoidance of doubt, the Debtors intend that such conversion would occur in the FIL Account going forward.

transfers, automated clearinghouse transfers, electronic funds transfers, and other debits and to treat the Accounts for all purposes as debtor-in-possession accounts. In addition, to maintain the integrity of their Cash Management System, I believe that the Debtors should be allowed pay all prepetition Bank Fees, if any, and to continue to pay Bank Fees in the ordinary course on a postpetition basis.

33. The Debtors also may have used various pre-printed documents (the "<u>Business Forms</u>"), such as checks, invoices, and letterhead, prior to the Petition Date. To the extent, the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession. Nonetheless, most parties doing business with the Debtors will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding these chapter 11 cases and the notice of commencement served on parties in interest. Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates. Thus, I believe that the Debtors should be authorized to use their existing Business Forms, if any, without placing a "Debtor In Possession" legend on each, until their existing stock is depleted.[12] Once the Debtors have exhausted their existing stock of checks or forms, any new check stock or subsequently printed checks or forms will bear the designation "Debtor In Possession" with the joint case number. To the extent that checks or forms are prepared electronically, the debtors will add a "Debtor In Possession" designation to such checks within fourteen (14) days of the Petition Date.

34. Further, from time to time, in the ordinary course of business, resources are shared between the Debtors and certain affiliated entities. These resources include funds, personnel, and logistics and operational services (collectively, the "<u>Intercompany Transactions</u>"). The

---

[12] The Debtors did not generally use such forms in their businesses, but nonetheless seek the relief to do so.

Intercompany Transactions result in receivables and payables (the "Intercompany Claims"). At any given time, there may be intercompany balances owing by one Debtor or non-Debtor affiliate to another Debtor or non-Debtor affiliate.

35. For instance, the Debtors and DSM engage in certain Intercompany Transactions. This relationship is detailed in part by certain "Management Services Agreement[s]" (the "MSAs") entered into between the each of the Debtors and DSM. Pursuant to the MSAs, DSM and its personnel provide the Debtors with critical management and administrative support services which include, without limitation: general management; use of hardware, software, and infrastructure; corporate accounting and internal controls; communication and management information systems; and other management services as deemed necessary. Under the MSAs, the Debtors are to pay an aggregate of $57,500 per month for such services. In the ordinary course of business, the Debtors paid additional amounts to DSM as the operational expenses of the Debtors increased and the Debtors took on additional investors. DSM is also party to a certain "Joint Collaboration Agreement" (together with the MSAs, the "Shared Services Agreements") with the Debtors and DSM's former affiliate, DLT ASA, under which DSM is responsible for the operational management of the storage hardware and software owned or used by FSP and any personal required to operate its Filecoin Network, including payroll and analogous independent contractor payments. In addition, as part of the Debtors' historical practice, at times, the conversion of FSP's FIL to U.S. dollars would occur at the File Storage Ops 1 level, with the resulting liquidated cash remitted to FSP's Deposit Account, but the Debtors intend that all such conversions would occur in the FIL Account going forward.

36. Based on the Shared Services Agreements, in the ordinary course of business, the Debtors' operations, including the critical and substantially pared down personnel performing such

operations, are managed and paid by and through DSM. The Debtors utilize their funds (which will include the proposed DIP loan) to pay DSM for the operational expenses associated with the Debtors, including the Debtors' taxes, rent, accounts payable, and compensation of DSM's personnel.[13] These Intercompany Transactions enable the Debtors to fund their operations and thus are integral to the continued operation of the Debtors' businesses. Indeed, as of the Petition Date, the Debtors maintain no direct employees or other personnel and rely entirely on the critical personnel primarily contracted with by DSM, who in turn rely on funding from the Debtors for their salaries.

37. Based on the foregoing, I believe that payment of certain limited outstanding prepetition obligations, in no event exceeding $200,000 (as set forth in the DIP Budget), related to Intercompany Transactions and continuing the Intercompany Transactions post-petition is the most efficient and reasonable approach to obtaining necessary services and addressing the covered business expenses, especially in light of the proposed debtor-in-possession financing. I further believe that disallowing the continued use of Intercompany Transactions would unnecessarily disrupt the Debtors' businesses and the Cash Management System to the detriment of the Debtor and its stakeholders. As a result, I believe that the Debtors should have the ability to pay certain pre-petition and post-petition obligations on Intercompany Transactions, consistent with the Debtors' customary prepetition practices and consistent with the DIP Budget. In addition, I believe that the Intercompany Transactions should be granted administrative expense priority status, which will facilitate the orderly and efficient operation of the Debtors' enterprise on a postpetition basis.

38. Without the relief requested, I believe the Debtors would be unable to effectively and efficiently maintain their financial operations. Such a result would cause significant harm to the

---

[13] As of the Petition Date, there are nine (9) individuals that perform services for the Debtors who are independent contractors of DSM or its English and Welsh affiliate.

Debtors' businesses and the value of their estates. Accordingly, the relief requested is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

> **C. Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362, 363(c), 363(e), 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to § 364 of the Bankruptcy Code; (II) Authorizing Use of Cash Collateral Pursuant to § 363 of the Bankruptcy Code; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to the Prepetition Secured Party; and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) (the "DIP Motion")**

39. By the DIP Motion, the Debtors respectfully request that the Court enter interim and final orders (a) authorizing the Debtors' Post-Petition financing (the "DIP Financing") with KB Silver Funding, LLC ("DIP Lender") as lender under that certain Superpriority Debtor-in-Possession Term Sheet dated June 30, 2023 ("DIP Term Sheet") and granting security interests and providing super-priority administrative expense status pursuant to 11 U.S.C. section 364(c) and (d); (b) authorizing the use of cash collateral and pay certain related fees and charges; (c) modifying the automatic stay pursuant to 11 U.S.C. §362; (d) scheduling a final hearing with respect to the relief requested herein pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure; and (e) granting related relief (the "DIP Motion"). Specifically, by the DIP Motion, the Debtors request interim and final authorization for them to obtain the DIP Financing, which if approved on a final basis would consist of post-petition financing in the Maximum Amount of $1,500,000.00, with $200,000.00 available on an interim basis (the "DIP Financing").

40. Unsecured financing is not available to the Debtors. The Debtors exhausted any realistic paths to obtain any additional unsecured financing or additional investors. During the last twelve (12) months, the Debtors and their prior owners, ASA, approached or were approached by over a dozen interested parties seeking an acquisition or joint venture and entered into non-disclosure agreements with certain interested parties, however, no transaction came to fruition.

41. In May 2023, the Debtors were introduced to a capital provider in connection with a forward sale of the future production of FSP in a transaction which was targeted to provide $3 million of non-dilutive funding to the Debtor. This transaction fell through because the price of FIL fell by 50% during the period when the conversations were proceeding. Likewise in the second quarter of 2023, the Debtors had discussions with a number of other FIL purchasers and investors, but did not culminate in a transaction. As noted above, the Debtors ultimately engaged in discussions with Silvermine in spring 2023, initially regarding an investment, and subsequently, regarding the current contemplated financing and sale of the Debtors.

42. Silvermine (through its affiliate, the DIP Lender) was the only party that expressed interest in providing financing to the Debtors pending court approval of the sale of the Debtors' assets but would do so only if such financing were on a secured basis. The DIP Lender expressed interest in providing financing in the form of debtor-in-possession financing in the context of a chapter 11 case.

43. As discussed in detail above, these Chapter 11 Cases follow months of efforts by the Debtors to attract capital or consummate strategic transactions. Faced with the depletion of liquidity, possibility of losing valuable market position and intellectual property, the potential loss of the staff and management, and the inability to obtain further funding outside of Chapter 11, the Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Financing. The Debtors' management ultimately concluded that the DIP Financing will provide immediate access to capital to pay their limited ongoing operating expenses while enabling the Debtors to seek a sale of their assets in these cases.

44. Without this financing, the Debtors' untapped potential for value would be lost, and the Debtors would most likely have dissolved or liquidated under chapter 7 with no chance for a

recovery to their creditors. The DIP Financing is the Debtors' best and only means of obtaining the liquidity necessary to avoid a shutdown of their businesses, preserve going concern value pending a sale of their assets.

45. The proceeds of the DIP Financing are sized to preserve and promote the viability of the Debtors' assets and support the Debtors through the anticipated pendency of these chapter 11 cases, but nothing more. Moreover, the financial terms and covenants of the DIP Financing are standard and reasonable for financing of this kind.

46. Based on the Debtors' negotiations regarding the DIP Financing, the terms of the DIP Financing constitute, on the whole, the most favorable terms the Debtors could achieve upon which the DIP Lender will extend the necessary post-petition financing. Although the Debtors explored whether the DIP Lender would provide the DIP Financing without certain provisions, in the course of negotiations, the DIP Lender indicated it would not be willing to provide the DIP Financing without such terms. In particular, the DIP Lender would not provide financing without the provisions requiring, in particular, securing the DIP Financing with the appropriate super priority claims. These are key components of consideration for the DIP Lender without which it has indicated it is unwilling to provide the DIP Financing.

47. Accordingly, the Debtors, in consultation with their advisors and in light of the significant liquidity crush they were facing, determined that the terms of the DIP Financing were superior to any options reasonably available to the Debtors at this time. Therefore, the DIP Financing provides the Debtors with the best, most feasible, and value-maximizing financing option available at this time.

48. Moreover, the Debtors have concluded that the economic terms of the DIP Financing are fair and reasonable and are consistent with what can be expected in a debtor-in-

possession financing. After thorough analysis by the Debtors and advisors have concluded that the terms of the DIP Financing are reasonable and appropriate under the circumstances.

49. For these reasons, in the Debtors' prudent business judgment, the terms of the DIP Financing are fair and reasonable in the circumstances of these cases and the Debtors could not obtain post-petition financing on such favorable lending terms. Accordingly, the relief requested in the DIP Motion is in the best interests of the Debtor, its estate and creditors, and all parties in interest.

## **CONCLUSION**

50. The Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to obtain financing and make certain critical payments and otherwise continue operating in the ordinary course of business as sought in the First Day Motions. In my opinion, approval of the relief requested in the First Day Motions will minimize disruptions to the Debtors' operations, thereby preserving and maximizing the value of the Debtors' estates for the benefits of their creditors and customers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 1, 2023  */s/ Timothy Furey*
Timothy Furey
Chief Restructuring Officer for the Debtors