# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 (Subchapter V) |
| FILE STORAGE PARTNERS, LLC, *et al.*,[1] | Case No. 23-10877 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Docket Ref. Nos. 5, 8, & 38** |

**AMENDED LIMITED OBJECTION AND RESERVATION OF RIGHTS OF AD HOC NOTEHOLDER GROUP TO (I) MOTION OF DEBTORS FOR ENTRY OF AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF; AND (II) MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO § 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO § 363 OF THE BANKRUPTCY CODE; (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTY; AND (V) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (C)**

The ad hoc group of noteholders (the "Ad Hoc Noteholder Group")[2] appear in these chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors-in-possession (the "Debtors") and submit this limited objection and reservation of rights (the "Objection") to the *Motion of the Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to § 364 of the Bankruptcy Code; (II) Authorizing Use of Cash*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842). The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

[2] At present, the Ad Hoc Noteholder Group organized for purposes of this Objection and a corresponding statement as provided by Bankruptcy Rule 2019 has been filed at Docket No. 64.

*Collateral Pursuant to § 363 of the Bankruptcy Code; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to the Prepetition Secured Party; and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c)* (the "DIP Motion") [Docket No. 5]; and the *Motion of Debtors for Entry of an Order (a) Approving the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (b) Authorizing the Assumption and Assignment of Contracts and Leases, and (c) Granting Related Relief* (the "Sale Motion") [Docket No. 8].[3] In support of this Objection, the Ad Hoc Noteholder Group respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Debtors, through the protections of subchapter V, seek bankruptcy protection, and substantially contemporaneously with the filing of the petition, approval of postpetition financing that encumbers otherwise unencumbered assets and an abbreviated sale process that puts the assets of the Debtors in the hands of the purchaser without realizing material value to creditors. This immediate combination is intended to do two things: (i) authorize the debtor to borrow a minimal amount from a strategic partner standing in a lender's shoes on a postpetition basis for a short duration, in exchange for which the lender receives a postpetition lien on all of the debtors' assets, whether previously unencumbered or otherwise, and (ii) obtain a sale of substantially all of the debtors' assets by and through which the lender (or an affiliate) will receive virtually every possible advantage in an abbreviated sale process so that it can obtain all of the value of the enterprise, free and clear of claims, liens and encumbrances, leaving little (if anything at all) for other stakeholders – and presumably the Noteholders (as defined below).

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Motion, the order granting the DIP Motion on an interim basis [Docket No. 76] (the "Interim DIP Order"), the related DIP credit agreements, of the Sale Motion, as applicable.

2.     Notwithstanding the commonality of this confluence of requested relief, under the circumstances, the Court should not approve the relief sought by the DIP Motion and Sale Motion, as filed, because the record does not support findings that the DIP financing was adequately shopped prepetition to determine market interest and should be marketed postpetition and further, and that the sale process on the extremely short time period is warranted. The result of such a combination is potentially value destructive and additional time should be afforded to the Noteholders and others to provide a meaningful opportunity to investigate the proposed sale and gauge market interest from other potentially interested parties. Until that time, and the Debtors demonstrate that the process achieves the highest and best purchase price and afford creditors with an opportunity to maximize a return on their claims without the encumbrance of such a one-sided DIP financing arrangement, the requested relief should be denied.

## BACKGROUND

**A.     The Debtors' Prepetition Financing.**

3.     The Debtors, through a series of non-debtor subsidiaries entered into approximately $25 million dollars' worth of promissory notes (the "<u>Notes</u>") with noteholders (the "<u>Noteholders</u>").[4] According to the Debtors' schedules, the total amount of outstanding notes across the four File Storage Ops LLCs is over $23 million.

4.     In May through approximately July 2021, Debtors' subsidiary File Storage Ops I, LLC ("<u>FSO 1</u>") entered into certain promissory notes (the "<u>FSO 1 Notes</u>") with certain

---

[4] The Ad Hoc Noteholder Group reserves all rights to challenge the Debtors' subchapter V election. In the first day *Declaration of Timothy Furey, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions*, the Debtors ambiguously refer to the Noteholders as Subordinated SPV Investors. Docket No. 10, at ¶ 7.

3

16228139/2

Noteholders (the "FSO 1 Noteholders") in the approximate amount of $5,965,276.82.[5]  Schedule E/F at ¶3.3 of Statement of Financial Affairs of File Storage Partners, LLC.  Docket No. 38.

      5.      As part of the representations and warranties, the FSO 1 Notes provide that:

> (d) The nature of the business of Company [defined as "File Storage Ops 1 LLC"] is the storage mining of Filecoin, the native token of the decentralized storage network named Filecoin. Company is engaged in business, is not in the organizational stage or in bankruptcy or receivership and is not a blank check, blind pool, or shell company that has no specific business plan or purpose or has as its primary business plan to engage in a merger or combination of the business with, or an acquisition of, an unidentified person. Company intends to use the Principal Amount solely for the operation of the Company's business. Company's managers, exercising their fiduciary duties, have approved Company's making of this Note, based upon a reasonable belief that the Note is appropriate for Company after reasonable inquiry concerning Company's financing objectives and financial situation.

FSO 1 Notes, at §§ 5(d), Recitals.

      6.      To this end, the Company planned to acquire its mining hardware either directly or indirectly from third party manufacturers (or the "Suppliers," as defined in the FSO 1 Notes) and the Company was to procure mining hardware from Suppliers at a total cost of approximately $2,000,000.  FSO 1 Notes, Exhibit A (Risk Factors) at A-7.

      7.      Indeed, FSO 1 was presented as an investment in a Filecoin Storage Facility (the "FSO 1 Mining Facility"), and the funding of FSO1 was, among other things, to the purchase of $6,000,000 in storage (storage miners) and specifically, miners to be used in developing a FIL storage mining facility in Nebraska.  Attached hereto as Exhibit B is a true and correct copy of the May 2021 FSO1 investment presentation.  The Debtor File Storage Partners, LLC would serve as the Operator and charge a 20% fee.  Id. at p.7.

---

[5] A true and correct copy of a form FSO1 Note of an Ad Hoc Noteholder Group member is attached hereto as Exhibit A.

8. The FSO 1 Notes have a maturity date of (i) May 31, 2041, or (ii) the date of the occurrence of a "Default," which definition includes bankruptcy proceedings, and required the Company (as defined in the FSO 1 Notes as FSO1) to make quarterly principal and interest payments. *See* FSO 1 Notes, at §§ 1, 2 & 9.

9. The FSO 1 Notes also include a "Call Option" which provides the series 1 Noteholders with the right to participate in a Sale Transaction (as defined in the FSO 1 Notes), as provided therein, that requires the sale consideration to be for the fair market value of at least three (3) times the aggregate principal amount of all series 1 notes, as determined by an independent third-party valuation agency. *Id.* at § 7.

10. In May 2023, leading up to the bankruptcy filings, the Debtors attempted to restructure the Notes and convert them to equity in Debtor File Storage Partners LLC through a "Debt for Equity Exchange Agreement" but, upon information and belief, those efforts failed because certain Noteholders refused to accept the Debtors' proposal.

**B.     The Debtors' Chapter 11 Cases.**

11. On June 30, 2023 (the "<u>Petition Date</u>"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11, subchapter V, of the Bankruptcy Code with this Court.

12. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1007(a) and 1108 of the Bankruptcy Code. To date, no trustee, examiner, or statutory committee has been appointed in the cases by the United States Trustee (the "<u>U.S. Trustee</u>").

**C. The DIP Motion.**

13. On the Petition Date, the Debtors filed the DIP Motion, by and through which the Debtors seek authority to borrow a total of $1,500,000 from KB Silver Funding, LLC (the "DIP Lender"), with the Debtors immediately borrowing $200,000 on an interim basis[6] up to an additional $1,300,000 upon entry of the Final Order.

14. In exchange for the loan, DIP Lender will receive a first-priority lien (other than with respect to the Prepetition Permitted Liens and the Carve-Out) on substantially all of the estates' assets, whether or not previously encumbered, including proceeds from all of the estates' claims and causes of action including avoidance actions. DLTx, LLC, an indirect affiliate of the Debtors, has agreed to guarantee the DIP Obligations.

15. The terms of the DIP Agreement also, among other things, includes milestones for an abbreviated sale process culminating in approval of a sale no more than forty (40) days after the Petition Date, and consummation of a sale within fourteen (14) days of a sale order being entered. *See* DIP Motion, at p. 14. The estates would be liable to pay a fixed interest rate of 15% per annum. *Id.* at p. 12.

16. Further, the DIP Lender will also receive a superpriority administrative expense pursuant to Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code), subject to the Carve-Out (the "DIP Facility Superpriority Claims"). *Id.* at § (6) a.

---

[6] The authorized interim amount has been increased from $235,000 to $431,000 pursuant to the Debtors' Second Interim DIP Order entered on July 24, 2023 and a final hearing is scheduled for August 1, 2023 at 1:00 p.m. (ET). Docket No. 43.

**D.     The Sale Motion.**

17.     Also on the Petition Date, the Debtors filed the Sale Motion, by and through which they seek the sale of substantially all of the Debtors' assets at a private sale to the DIP Lender via a credit bid of the DIP Facility Obligations plus the full amount of the DIP Obligations funded through the Closing, projected to be about $1,000,000.00.  As set forth in the Sale Motion, the sale is to close no later than August 23, 2023.

18.     In the Sale Motion, the Debtors maintain that during the months preceding the bankruptcy, while they faced liquidity constraints and caused reductions in their workforce, the Debtors "approached numerous institutions and equipment financers" to raise short-term capital. *See* Sale Motion at ¶ 9.  None were willing to risk lending on an unsecured basis.  *Id.*  Silvermine Capital Advisors, LLC ("Silvermine"), though, was willing.  It agreed to restructure the Debtors operations on terms set forth in the DIP Motion.

19.     The Debtors description of the process is dubious.  At the same time as Silvermine was offering to save them from distress, the Debtors admit that they had "difficulty in locating parties that underst[oo]d the Debtors' assets and business model" so no other entities showed interest in financing the cases or acquiring the Debtors' assets.  *See* Sale Motion at ¶ 12.  This lack of effort has effectively resulted in private sale of a debtors' going-concern business through a bankruptcy process.

20.     The Debtors present the Sale Motion as a section 363 sale and seek approval of a sale process that would require approval of a sale just forty (40) days after the Petition Date.

**BASIS FOR OBJECTION**

21. One of the primary purposes of the Bankruptcy Code is to maximize the value of the bankruptcy estate for the benefit of creditors. *Matter of Midway Airlines, Inc.*, 6 F.3d 492, 494 (7th Cir. 1993); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (a debtor, as a fiduciary to the estate, has a duty to maximize the value of the estate). To further this purpose, sale procedures must seek to "facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-66 (8th Cir. 1997) (bankruptcy courts are given discretion and latitude in order to facilitate a fair and open public sale focused on maximizing value).

22. The Debtors assert that management took the steps they deemed necessary to exercise their best business judgement in negotiated the DIP Financing[7] and "ultimately concluded that the DIP Financing will provide immediate access to capital to pay their limited ongoing operating expenses while enabling the Debtors to seek a sale of their assets in these cases." Furey Decl. at ¶ 43. But at what cost to the creditors? Most "quick sale" bankruptcy cases face some tension between conducting a comprehensive sale process to maximize the value of the debtor's estate and an abbreviated process minimizing postpetition administrative expenses and providing certainty to the transaction for the benefiting stakeholders.

23. The proposed break-neck pace sought by the Debtors and DIP Lender, however, is simply too aggressive, especially given that the sale is a private sale, extracts all value away from creditors, and not the product of an open auction and would eviscerate any meaningful opportunity

---

[7] The Debtors can only agree to encumber or sell assets that they own. Because FSO1 and not the Debtors represented that it was to purchase (or did purchase) the mining equipment at the FSO 1 Mining Facility, Debtors may not be the owners of certain equipment.

for the Ad Hoc Noteholder Group to try to find alternative purchasers who could provide greater value to the estates. This is particularly troubling considering that in May, the Debtors were attempting to restructure the Notes through a debt for equity swap. The record is absent on whether the Debtors attempted to reach out to Noteholders to assess whether they would be willing to extend additional credit to the Debtor on more favorable terms than that of the proposed DIP Lender and whether any such DIP facility would exclude the DIP Facility Superpriority Claims, which may have meaningful value to these estates.

24. Furthermore, the deadlines set forth in the DIP and Sale Motion are unreasonably short, especially after running (at most) a scant prepetition sale process. Indeed, there is no indication that the Debtors have approved any strategic buyers to truly shop the company. *See* Sale Motion, at §§ 9–11. Now, the Debtors are seeking approval of effectively a private sale to Silvermine process just forty (40) days after the Petition Date. Yet, the Debtors want to lock up the sale process through a modest DIP financing arrangement that, among other things, locks up any unencumbered value of the Debtors' assets without any rights to challenge the financing and specifically, the waiver of claims against the DIP Lender without first giving parties in interest, including, but not limited to, any official committee appointed in these cases, at least seventy-five (75) days from the entry of the initial interim order to investigate such matters. *See* Del. Bankr. L.R. 4001-2 (1)(Q). There is no analysis that the DIP is reasonable under the circumstances considering the potential value of the Debtors' assets.

25. The Court should not merely defer to the Debtors' asserted business judgment. In this subchapter V case where no committee of unsecured creditors are appointed to ferret our questionable activity, filed in an apparent attempt to gerrymander creditors from the non-debtor subsidiaries, the Ad Hoc Noteholder Group submits it makes little sense to allow a private sale

9

process encompassing the credit bid to go forward. *See In re O'Brien Envtl. Energy, Inc.* 181 F.3d at 535-37 (3d Cir. 1999) (recognizing that more competitive bidding will bring a greater benefit to the estate). There is no evidence whether the management team has any experience marketing these assets. As stated, the private sale proposal deters competitive bidding and provides unnecessary and unwarranted protections for the DIP Lender or its affiliate.

26. The proposed scheme and schedule would eviscerate any meaningful opportunity to explore new and alternative purchasers, which could provide greater value to the estates and will wipe out millions of dollars in Notes. The Ad Hoc Noteholder Group requests the deadlines associated with the sale, and final deadlines associated with the DIP Financing and proposed sale, be extended by at least sixty days to ensure that all parties-in-interest have a fair opportunity to perform due diligence and submit a bid. *In re Energy Future Holdings Corp*., (Bankr. D. Del. Nov, 4 2014) (Case No. 14-10979) (CSS) Tr. at 20:16-20 (holding that "… the proposed timelines must be stretched …to allow for sufficient time for any interest party to develop an alternative transaction . . . ."). This will allow minimal time for the following: (i) the Ad Hoc Noteholder Group to confer with the Debtors' professionals, the Subchapter V Trustee and Office of the United States Trustee, (ii) solicitation of those other potentially interested parties (including all Noteholders), (iii) those interested parties to execute and return nondisclosure agreements, if necessary, (iv) have those parties conduct due diligence, and (v) submit a bid. Absent a further extension of time, that process is not feasible. The timing required by the DIP and Sale Motion needs to be adjusted to allow for a reasonable period of time if the buyer is to receive the protections it seeks under section 363 as a good faith purchaser at arms-length.

16228139/2

## RESERVATION OF RIGHTS

27. The Ad Hoc Noteholder Group reserves the right to raise additional issues with the proposed DIP Facility and the Sale at any time prior to or at the hearing to consider the motions.

**WHEREFORE**, the Ad Hoc Noteholder Group of seek (i) entry of an Order denying the DIP Motion as requested, and without the prior authorization and consent of the Ad Hoc Noteholder Group (or any subsequently appointed Official Committee of Unsecured Creditors), (ii) entry of an Order denying the Sale Motion, including the timing for the sale process, subject to modifications set forth herein, and (iii) such other and further relief as is just and appropriate.

Dated: July 28, 2023

*/s/ Eric J. Monzo*
Eric J. Monzo (DE Bar No. 5214)
Tara C. Pakrouh (DE Bar No. 6192)
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
E-mail: tpakrouh@morrisjames.com

*Counsel for the Ad Hoc Noteholder Group*