# **EXHIBIT A**

FSO1 Note of an Ad Hoc Noteholder Group

DocuSign Envelope ID: 0453FF1A-804E-4CEB-AB20-475678EDCD9F

THIS INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"). IT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR UPON RECEIPT BY THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT.

## PROMISSORY NOTE

| Principal Amount | Date of Issuance |
|---|---|
| **$ 200,000** | **May 22, 2021** |

FOR VALUE RECEIVED, File Storage Ops 1 LLC, a Delaware limited liability company (the "**Company**"), promises to pay to the order of **Electric SB Limited** (the "**Holder**"), with its principal address located at **Wierton Cottage Maidstone, Kent ME17jt**, at Holder's address set forth herein or at such other place as Holder may designate in writing from time to time, the principal sum of **two hundred thousand U.S. Dollars (US$200,000)** (the "**Principal Amount**"), together with interest as provided herein, pursuant to this Promissory Note (this "**Note**").

This Note is one of a series of promissory notes (collectively, the "**Series 1 Notes**") issued by Company to its lenders (collectively, the "**Series 1 Holders**") with identical terms and conditions as set forth herein (except that the lender, principal amount and date of issuance may differ in each promissory note in the series).

Company promises to pay the Principal Amount, interest and other charges evidenced in this Note in accordance with the terms and conditions contained herein.

1. <u>Maturity Date</u>. The Principal Amount, interest and all other amounts due under this Note shall be payable on the earlier of (i) May 31, 2041, or (ii) the date of the occurrence of a Default (the "**Maturity Date**").

2. <u>Principal Payment; Interest Payment</u>. The Company will repay the entire Principal Amount and interest in the following manner:

   A. Until the Maturity Date, the Company shall make the following payments:

      i. <u>FIRST</u>, quarterly payments of interest to the Series 1 Holders, *pro rata* and *pari passu*, on the aggregate outstanding Principal Amount of all Series 1 Notes, in a variable amount equal to eighty percent (80%) of the Company's Adjusted Gross Revenue (as defined below) for such quarter, until the total amount of interest payments made to the Series 1 Holders is equal to the aggregate outstanding Principal Amount of all Series 1 Notes (at which time interest payments pursuant to this Section 2.A.i shall cease); and thereafter,

      ii. <u>SECOND</u>, from and after the cessation of the interest payments pursuant to Section 2.A.i, quarterly payments of interest to the Series 1 Holders, *pro rata* and *pari passu*, on the aggregate outstanding Principal Amount of all Series 1 Notes, in a variable amount equal to twenty percent (20%) of the Company's Adjusted Gross Revenue for such quarter.

DocuSign Envelope ID: 0453FF1A-804E-4CEB-AB20-475678EDCD9F

B.  On the Maturity Date, the Company shall make the following payments:

    i.  <u>FIRST</u>, in the event that the aggregate amount of interest paid to Holder prior to the Maturity Date does not equal or exceed the accrued interest on the Principal Amount of this Note calculated at the Contract Rate, a payment to Holder in the amount of the shortfall in such accrued but unpaid interest; and

    ii. <u>SECOND</u>, a balloon payment to Holder in the amount of the outstanding Principal Amount of this Note.

C.  After the Maturity Date, Company shall make quarterly payments of interest at the Contract Rate, on the unpaid Principal Amount of this Note, until all accrued and unpaid interest and the unpaid Principal Amount has been paid in full.

For purposes of this Agreement, "**Adjusted Gross Revenue**" means all sums actually received by Company as consideration for its products or services, *less* (i) reasonable and verifiable third party out-of-pocket expenses, *less* (ii) any management fees due by Company to its manager or manager's designee, *less* (iii) any payments due by Company under a FIL Supply Agreement (as defined below), and *less* (iv) any other amounts necessary or advisable to reserve, designate, or set aside for actual or anticipated costs, payments, liabilities, obligations, and claims with respect to the Company's business, all as determined by the Manager.

3.  <u>Interest Rate</u>. Interest shall accrue on the unpaid Principal Amount of this Note at the fixed rate of five percent (5%) per annum (the "**Contract Rate**"). Upon the occurrence of a Default (as defined below), the entire unpaid Principal Amount, plus all accrued but then unpaid interest plus all other sums owed hereunder, shall be immediately due and payable, and each shall bear interest at a rate per annum equal to the Contract Rate *plus* two percent (2%) (the "**Default Rate**") from the date of the occurrence of a Default until paid in full. Interest shall be calculated on the basis of the actual number of days elapsed in a 365-day year.

4.  <u>Prepayment</u>.  Company may prepay all or any portion of this Note, on or after the fifteenth (15th) anniversary of the date of issuance and prior to the Maturity Date, without premium or penalty. All payments and prepayments on this Note shall be applied as follows: *first*, in the event that the aggregate amount of interest paid to Holder prior to the prepayment date does not equal or exceed the accrued interest on the Principal Amount calculated at the Contract Rate, a payment to Holder in the amount of the shortfall in such accrued but unpaid interest; and *second*, to the reduction of the Principal Amount. All payments of interest and principal under this Note shall be made in lawful money of the United States of America.

5.  <u>Representations and Warranties of Company</u>.  Company represents and warrants to Holder as of the date of this Note that:

(a)    Company is a limited liability company duly organized and validly existing and in good standing under the laws of the State of Delaware, and is duly qualified to do business, and is in good standing, in every jurisdiction in which the nature of its business requires it to be so qualified. Company has all requisite power and authority to carry on its business as now conducted.

(b)     Company has full power and authority to enter into, execute, deliver and perform its obligations under this Note. When duly executed and delivered by Company, this Note will constitute a legal, valid and binding obligation of Company, enforceable against Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(c)     The execution, delivery and performance by Company of this Note will not conflict with or result in the breach of or constitute a default under any other agreement or instrument to which Company is a party or by which it or its property is bound, including but not limited to any FIL Supply Agreement (each, a "**FIL Supply Agreement**"), or result in the creation of any lien thereunder.

(d)     The nature of the business of Company is the storage mining of Filecoin, the native token of the decentralized storage network named Filecoin. Company is engaged in business, is not in the organizational stage or in bankruptcy or receivership and is not a blank check, blind pool, or shell company that has no specific business plan or purpose or has as its primary business plan to engage in a merger or combination of the business with, or an acquisition of, an unidentified person.  Company intends to use the Principal Amount solely for the operation of the Company's business. Company's managers, exercising their fiduciary duties, have approved Company's making of this Note, based upon a reasonable belief that the Note is appropriate for Company after reasonable inquiry concerning Company's financing objectives and financial situation.

6.     <u>Representations and Warranties of Holder</u>.  Holder represents and warrants to Company as of the date of this Note that:

(a)     Holder is (i) an individual, or (ii) a limited liability company or corporation, duly organized or incorporated, as applicable, validly existing and in good standing under the laws of the state set forth in the signature block of Holder, and is duly qualified to do business, and is in good standing, in every jurisdiction in which the nature of its business requires it to be so qualified, with all requisite power and authority to carry on its business as now conducted.

(b)     Holder is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act, in that Holder is one or more of the following:

    (i)     A natural person who had individual income of more than US$200,000 in each of the most recent two years or joint income with Holder's spouse in excess of US$300,000 in each of the most recent two years and who reasonably expects to reach that same income level in the current year;

    (ii)     A natural person whose individual net worth, or joint net worth with Holder's spouse, is in excess of US$1,000,000 (excluding the value of the primary residence of such natural person);

    (iii)     A natural person holding in good standing one or more professional certifications or designations or credentials from an accredited educational institution designated as qualifying an individual for accredited investor status;

(iv) An organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation or a partnership not formed for the specific purpose of acquiring the Securities, with total assets in excess of US$5,000,000;

(v) A trust, with total assets in excess of US$5,000,000, which was not formed for the purpose of making the Loan and whose entry into this Note is directed by a person who has such knowledge and experience in financial business matters that such person is capable of evaluating the risks and merits of the Loan;

(vi) An entity (corporation, limited liability company, partnership, etc.) with total assets in excess of US$5,000,000;

(vii) A bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended; an insurance company as defined in Section 2(13) of the Securities Act; an investment company registered under the Investment Company Act of 1940, as amended, or a business development company as defined in Section 2(a)(48) of the Investment Company Act of 1940; a plan established and maintained by a state, its political subdivisions, or an agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, with total assets in excess of US$5,000,000; or an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of the Employee Retirement Income Security Act of 1974, which is either a bank, savings association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of US$5,000,000 or, if the employee benefit plan is a self-directed plan, the investment decisions are made solely by persons that are accredited investors as defined in Regulation D under the Securities Act;

(viii) A private business development partnership as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(ix) An entity in which all of the equity owners meet the requirements of at least one of the above subparagraphs for accredited investors;

(x) A natural person who is a "knowledgeable employee," as defined in rule 3c-5(a)(4) under the Investment Company Act of 1940 (17 CFR 270.3c-5(a)(4)), of the issuer of the Note being offered or sold where the issuer would be an investment company, as defined in section 3 of such act, but for the exclusion provided by either section 3(c)(1) or section 3(c)(7) of such act;

(xi) Any "family office," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1) with assets under management in excess of $5,000,000, that is not formed for the specific purpose of making the Loan, and whose prospective investment is directed by a person who has such knowledge and experience in financial and business matters that such family office is capable of evaluating the merits and risks of the prospective investment; or,

(xii) Any "family client," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1)), of a family office meeting the requirements in section (xi) of this section and whose prospective investment in the issuer is directed by such family office pursuant to paragraph (a)(12)(iii).

(c) Holder is a lender to companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of the loan (the "**Loan**") to Company represented in this Note, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the Loan. Holder has no immediate need for liquidity, does not anticipate being required to transfer this Note in the foreseeable future and has the capacity to sustain a complete loss of the Principal Amount.

(d) Holder has reviewed and understands the Risk Factors attached hereto as Exhibit A ("**Exhibit A**").

(e) Holder acknowledges that Company is agreeing to enter into this Note in reliance upon the Holder's representation to Company, which Holder hereby confirms by executing this Note. By executing this Note, Holder further represents that Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to this Note. If other than an individual, Holder also represents it has not been organized solely for the purpose of making this Loan.

(f) Holder has received all the information it considers necessary or appropriate to enable it to make an informed decision concerning a Loan to the Company. Holder further represents that it has had an opportunity to ask questions and receive answers from Company regarding the terms and conditions of the Loan. Holder confirms that Company has not given any guarantee or representation as to the potential return, effect or benefit (either legal, regulatory, tax, financial, accounting or otherwise) of a Loan to Company. In deciding to enter into this Note, Holder is not relying on the advice or recommendations of Company and has made its own independent decision that the Loan to Company is suitable and appropriate for Holder. Holder understands that no federal or state agency has passed upon the merits or risks of this Loan or made any finding or determination concerning the fairness or advisability of this Loan.

(g) Holder understands that the Note has not been, and will not be, registered under the Securities Act or state securities laws, by reason of specific exemptions from the registration provisions thereof which depend upon, among other things, the bona fide nature of the Loan and the accuracy of Holder's representations as expressed herein. Holder understands that Holder must hold this Note until repaid according to its terms, unless registered with the Securities and Exchange Commission ("**SEC**") and registered or qualified by state authorities, or an exemption from such registration and qualification requirements is available. Holder acknowledges that Company has no obligation to register or qualify the Note for resale and further acknowledges that, if an exemption from registration or qualification is available, it may be conditioned on various requirements, which Company is under no obligation, and may not be able, to satisfy.

(h) Holder has reviewed with its own tax advisors the federal, state and local tax consequences of this Loan, where applicable, and the transactions contemplated by this Note. Holder is relying solely on such advisors and not on any statements or representations of Company or any of its

agents and understands that Holder (and not Company) shall be responsible for Holder's own tax liability that may arise as a result of this Loan or the transactions contemplated by this Note.

7. <u>Call Option</u>.

(a)     In the event that Company approves a Sale Transaction (as defined hereunder), then, upon the written request of the Managers, subject to applicable law, each Series 1 Holder shall (i) transfer its, his or her Note in the Sale Transaction on the terms and conditions that apply to the Sale Transaction, (ii) consent to, raise no objections against, and agree with such Sale Transaction, (iii) execute and deliver all documents and instruments that are necessary or desirable as reasonably determined by the Managers to effectuate such Sale Transaction (including any subordination agreement or security agreement, if any) and (iv) waive all rights, including any appraisal rights, in connection with such Sale Transaction, such waiver to survive the termination of this Note. The Managers shall provide written notice of such Sale Transaction to each Series 1 Holder not less than ten (10) days prior to the proposed consummation of the Sale Transaction. Such notice shall identify the proposed purchaser, the consideration offered and any other material terms and conditions. The obligations of any Series 1 Holder to participate in a Sale Transaction are subject to the satisfaction of the condition that, upon consummation of the Sale Transaction, each Series 1 Holder shall receive the same form and amount of consideration as the other Series 1 Holders in accordance with the Principal Amount borrowed from each Series 1 Holder, in each case *pro rata*.

(b)     Each Series 1 Holder shall make or provide the same representations, warranties, covenants, indemnities and agreements as the other Series 1 Holders make or provide in connection with the Sale Transaction, including but not limited to such Series 1 Holder's title to the Note being sold and the Series 1 Holder's power, authority, and right to enter into the Sale Transaction without contravention of law or contract; *provided*, *however*, that no Series 1 Holder shall have any obligation or liability with respect to any other Series 1 Holder's representations and warranties of the type described in this sentence. Company shall provide to each Series 1 Holder a copy of the fully executed definitive agreement in connection with the Sale Transaction as soon as reasonably practicable after its execution.

(c)     Notwithstanding anything to the contrary contained herein, with respect to a Sale Transaction, each of the Series 1 Holders hereby collectively and irrevocably constitute and appoint the Managers as such Series 1 Holder's attorney-in-fact, agent and representative (in such capacity, the "**Controlling Person**") to act from and after the date of the Sale Transaction notice to do any and all things and execute any and all documents which may be necessary, convenient or appropriate to facilitate the consummation of the Sale Transaction, including but not limited to: (i) negotiation and execution of the documents and certificates pursuant to a Sale Transaction; (ii) receipt of payments under or pursuant to a Sale Transaction and disbursement thereof to the Series 1 Holders and others, as contemplated by such Sale Transaction; (iii) giving or agreeing to, on behalf of all or any of the Series 1 Holders, any and all consents and waivers deemed by the Controlling Person, in its reasonable and good faith discretion, to be necessary or appropriate in connection with a Sale Transaction and the execution or delivery of any documents that may be necessary or appropriate in connection therewith; and (iv) engaging attorneys, accountants, agents or consultant  on behalf of the Series 1 Holders in connection with any Sale Transaction or any other agreement contemplated thereby and paying any fees related thereto to be either paid directly by Company or to be allocated *pro rata* among the

DocuSign Envelope ID: 0453FF1A-804E-4CEB-AB20-475678EDCD9F

Series 1 Holders based upon their proportionate consideration distributable as a result of the transactions in question; *provided* that in each case, the Controlling Person shall not take any action adverse to any Series 1 Holder unless such action is also taken with respect to other similarly situated Series 1 Holders; and *provided further*, that this limited power-of attorney with respect to any Sale Transaction shall be terminated effective as of one hundred eighty (180) days after the date of the Sale Transaction notice if such Sale Transaction has not been consummated by such date. All acts of the Controlling Person hereunder in its capacity as the agent and representative of the Series 1 Holders shall be deemed to be acts on behalf of the Series 1 Holders and not of the Controlling Person individually. The Controlling Person shall not be liable to the Series 1 Holders in its capacity as agent and representative for any liability of a Series 1 Holder or otherwise or for any error of judgment, any act done or step taken or for any mistake in fact or law, in each case unless there has been a final, non-appealable determination by a court of competent jurisdiction that such error, act or mistake constituted fraud, bad faith, willful misconduct or gross negligence on the part of the Controlling Person. The Controlling Person may seek the advice of legal counsel in the event of any dispute or question as to the construction of any of the provisions of this Note or its duties hereunder, and it shall incur no liability in its capacity as agent and representative to the Series 1 Holder or the Company and shall be fully protected with respect to any action taken, omitted or suffered by it in accordance with the advice of such counsel. Notwithstanding any duty otherwise existing at law or in equity, to the fullest extent permitted by law the Controlling Person shall not by reason of this Note have a fiduciary relationship in respect of any Series 1 Holder. The appointment of the Controlling Person as the attorney-in-fact, agent and representative of the Series 1 Holder and the power-of- attorney granted hereby are each coupled with an interest and shall be perpetual and irrevocable by any Series 1 Holder in any manner or for any reason. This authority granted to the Controlling Person shall not be affected by the death, illness, dissolution, disability, incapacity, bankruptcy, insolvency or other inability to act of any Series 1 Holder pursuant to any applicable law.

(d)     In connection with any Sale Transaction, each Series 1 Holder shall bear his, her or its *pro rata* share (based upon the amount of consideration received by such Series 1 Holder) of (x) the costs of any Sale Transaction, to the extent such costs are incurred for the benefit of all Series 1 Holders, and (y) any post-closing or other liabilities, in each case on a several (not joint) basis. Each Series 1 Holder's respective potential liability in respect of the matters referred to in this Section (including any tax liability) shall not exceed the amount actually received by such Series 1 Holder in such transaction, except to the extent such liability arises as a result of fraud by such Series 1 Holder as determined by a final non-appealable judgment by a court of competent jurisdiction or by an arbitrator. Costs incurred by Series 1 Holders on their own behalf will not be considered costs of the transaction hereunder; it being understood and agreed that the fees and disbursements of one counsel chosen by the Controlling Person shall be deemed for the benefit of all Series 1 Holders participating in such Sale Transaction.

(e)     There shall be no liability on the part of the Manager if any transfer pursuant to this Section 7 is not consummated for whatever reason, regardless of whether the Manager has delivered notice of the proposed Sale Transaction to any Series 1 Holder.

For purposes of this Note, "**Sale Transaction**" means a written offer to Company by a third party or group of third parties to purchase, exchange or otherwise dispose the Series 1 Notes for cash, equity interests or participations in an entity (the "**Exchange Consideration**"), which Exchange

Consideration would have, as of the date of determination, a fair market value of at least three (3) times the aggregate Principal Amount of all Series 1 Notes, as determined by an independent third party valuation agency. The determination of the Exchange Consideration will not take into account any accrued interest that has been paid or any Principal Amount that has been repaid as of the date of the Sale Transaction. For the avoidance of doubt, a Change of Control (as defined hereunder) shall not constitute a Sale Transaction.

8. <u>Security</u>. Company hereby grants to Holder a security interest in all of Company's now owned or hereafter acquired assets, as well as all accessions, additions and improvements to, and all proceeds and products of such assets, to secure payment of the Principal Amount and accrued interest pursuant to this Note.

9. <u>Events of Default</u>. Notwithstanding anything to the contrary herein, this Note shall automatically become due and payable without notice or demand on the occurrence of any of the following events or conditions hereunder (a "**Default**"): (i) Company's failure to make any payment under this Note within thirty (30) days of its due date; (ii) Company's failure to perform any of the other material terms, agreements, covenants or conditions contained herein, if such failure is not cured within thirty (30) days after Company's receipt of written notice thereof; (iii) the commencement of any proceeding by or against Company for the liquidation, insolvency, bankruptcy, reorganization or receivership of Company, as applicable, which proceeding is not dismissed, discharged or stayed within a period of ninety (90) days after its entry or filing; (iv) Company's failure to make any payment under a FIL Supply Agreement within thirty (30) days of its due date; (v) Company's general assignment for the benefit of creditors; or (vi) Company's application for or allowing the appointment of a receiver, trustee, or custodian for its property or assets.

10. <u>Remedies</u>. If this Note is not paid when due, or is collected or is attempted to be collected by the initiation or prosecution of any means including, without limitation, suit before any court or by any other judicial proceeding, or is placed in the hands of an attorney for collection, then the Holder shall be entitled to collect, in addition to all of the amounts owing hereunder, all court costs and reasonable attorneys' fees incurred by the Holder.

11. <u>Survival</u>. The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Note.

12. <u>Separate Agreements</u>. Company's agreement with each Holder of the Series 1 Notes is a separate agreement and the loan by each such Holder under a Note is a separate loan. Unless otherwise expressly provided herein, the rights of the Holder hereunder are several rights, not rights jointly held with any other Series 1 Holder. Any invalidity, illegality or limitation on the enforceability of the Note or any part thereof, by any Series 1 Holder whether arising by reason of the law of the respective Series 1 Holder's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Note with respect to Holder. If any provision of this Note shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

13. <u>Entire Agreement; Waiver and Amendment</u>. This Note, together with its exhibits, constitutes the full and entire understanding and agreement between Holder and Company with regard to the subject hereof. Any term of this Note may be amended and the observance of any term may be waived (either generally or in a particular instance and either retroactively or prospectively) with

the written consent of Company and Holder. Any waiver or amendment effected in accordance with this Section 13 will be binding upon each future holder of this Note and the Company. The titles and subtitles used in this Note are included for convenience only and are not to be considered in construing or interpreting this Note.

14. <u>Restrictions on Transfers; Successors and Assigns</u>.  Holder will not assign its rights and/or obligations under this Note in any way, *provided*, *however*, that Holder may give written notice to Company prior to any proposed offer, transfer, sale or other disposition (each, a "**Transfer**") of the Note, describing the manner of such Transfer, together with a written opinion of Holder's counsel, or other evidence reasonably satisfactory to Company, to the effect that such Transfer may be effected without registration or qualification under any federal or state law then in effect. Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or such other evidence, Company shall notify Holder that Holder may Transfer the Note, all in accordance with the terms of the notice delivered to Company.  Except in connection with a Change of Control (as defined below) or pursuant to Section 7 of this Note, the rights, interests or obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by Company without the prior written consent of the then Series 1 Holders lending the majority of the then-outstanding Principal Amounts underlying all outstanding Series 1 Notes. Without limiting the foregoing, this Note shall be binding upon and inure to the benefit of each party's respective successors, transferees and/or permitted assignees.

For the purposes of this Note, "**Change of Control**" shall mean the occurrence of any of the following events: (i) a transaction or series of related transactions in which a person or group of persons becomes the beneficial owner, directly or indirectly, of more than 50% of the voting equity of Company, (ii) any reorganization, merger or consolidation of Company, other than a transaction or series of related transactions in which the holders of the voting equity of Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the voting equity of Company or such other surviving or resulting entity or (iii) a sale, lease, assignment, transfer, exchange or other disposition of all or substantially all of the assets of Company.

15. <u>Governing Law</u>. This Note shall be governed by and construed in all respects according to the laws of the State of Delaware, without regard to principles of conflicts of law.

16. <u>Severability</u>. In case any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

17. <u>Notices</u>. All notices required to be given hereunder shall be in writing and shall be either served personally, by U.S. mail, postage prepaid, certified, return receipt requested, or via a reputable international overnight express courier, in each case addressed to the Company or the undersigned Holder, as appropriate. Such addresses may be changed by notice to the other party given in the same manner as provided in this Section. Notices given by U.S. mail or overnight express courier shall be deemed to have been given on the date of delivery set forth in the confirmation of receipt thereof.

18. <u>Further Assurances</u>. From time to time, the parties will execute and deliver such additional documents and will provide such additional information as may reasonably be required to carry out the terms of this Note and any agreements executed in connection herewith.

19. <u>Non-Recourse Obligation</u>. Notwithstanding any other terms or provisions of this Note to the contrary, Company, its members, managers, officers, and its or their assigns shall have no personal liability for repayment of the Principal Amount or any interest thereon or other charges in connection therewith, *provided*, *however*, that nothing herein shall be construed to waive any right or remedy Holder may have at law or in equity for damages arising in the event of fraud, intentional misrepresentation, other willful misconduct, or gross negligence by Company or any member of Company.

*[Reminder of page intentionally left blank]*

20. <u>Advice of Counsel</u>.   Holder acknowledges that, in executing this Note, Holder has been encouraged, and has had the opportunity, to seek the advice of independent legal counsel, and has read and understood all of the terms and provisions of this Note. This Note shall not be construed against any party by reason of the drafting or preparation thereof.

21. <u>Counterparts</u>. This Note may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. Counterparts may be delivered via fax, electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method, and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**IN WITNESS WHEREOF**, the undersigned authorized signatories of the Company and the Holder have caused this Note to be executed as of the date first above written.

**COMPANY:**

**FILE STORAGE OPS 1 LLC**,
a Delaware limited liability company

By: File Storage Partners, LLC,
    its Manager

By: _____
Name:____David Johnston_____
Title:_____COO_____

**HOLDER:**

Name:__Electric SB Limited_____
State of residency, organization or
incorporation:___UK LTD Company_____
By: _____
Name:_Toby Lewis_____
Title:__Mr._____

11

# EXHIBIT A

## RISK FACTORS

These Risk Factors (the "**Risk Factors**") are attached as Exhibit A to the Promissory Note (the "**Note**"), and are being provided in connection with a series of loans from the Series 1 Holders (each, a "**Holder**", "**you**" or "**your**") to File Storage Ops 1 LLC (the "***Company***", "***we***", "***us***" and "***our***"). A loan to the Company evidenced by a Note involves a high degree of risk. You should carefully consider the following risk factors in evaluating the Company and its business before making the Loan. Capitalized terms not defined herein shall have the meaning ascribed to them in the Note.

Some of the statements made in these Risk Factors or in other communications between the Company and the Holder are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include statements about our expectations regarding our future liquidity, earnings, expenditures and financial condition. These statements are often identified by the words "will," "should," "anticipate," "believe," "expect," "intend," "estimate," "hope," or similar expressions. These statements reflect management's current views with respect to future events and are subject to risks and uncertainties. There are important factors that could cause actual results to differ materially from those in forward-looking statements, many of which are beyond our control. These factors, risks and uncertainties include, but are not limited to, the factors described below. Our actual results, performance, financial condition and liquidity could differ materially from those expressed in, or implied by, these forward-looking statements, and accordingly, we can give no assurances that any of the events anticipated by the forward-looking statements will transpire or occur, or if any of them do so, what impact they will have on our business, results of operations, financial condition or liquidity. In view of these uncertainties, prospective lenders are cautioned not to place undue reliance on these forward-looking statements. We expressly disclaim any obligation to publicly revise any forward looking statements that have been made to reflect the occurrence of events after the date hereof, except as required by law or regulation.

The Company intends to become profitable with its focus on a Filecoin ("**FIL**") storage mining operation (the "**Project**"). FIL is the native token of the peer-to-peer decentralized storage network named Filecoin (the "**Filecoin Network**"). The risks described below are not the only risks facing the Company or its business. Additional risks and uncertainties not currently known to the Company or our Managers, or that the Company currently believes to be immaterial, may materially and adversely affect the Company's business, financial condition or results of operations. The Risk Factors below should not be considered business, legal, tax, or accounting advice, and you should consult with your own business, legal, tax, and accounting advisors with respect to lending to the Company. The Company may update and revise these Risk Factors from time to time, but is under no obligation to do so.

**The Company's ability to make payments depends on cost effectively financing, implementing and operating the Project.**

The Company's ability to make payments to the Series 1 Holders that are sufficient to completely return the principal amount and accrued interest is dependent on the Project generating significant revenue in a relatively short amount of time. We cannot assure you that the Company will be able to implement its business plan in the same manner as currently contemplated, or that doing so will result in the amount of revenue expected. The Company was formed in 2021; we have little to no operations record on which you can evaluate our business and prospects.

A-1

**Competitors may be established and/or become more widely used.**

The Filecoin Network operates a storage marketplace. A user submits a bid order to request a service and deposits the FIL specified in the order. Storage miners offer their storage in the storage marketplace. When a user and a storage miner are matched, the user sends the data to the miner for storage and the parties enter into an agreement, which the platform then records on the blockchain.

Most FIL storage miners are based in China. While the Company considers its location in the United States a competitive advantage that will be attractive to Filecoin Network users, our prospects must be considered in light of the risks, uncertainties, expenses, and difficulties frequently encountered by companies in their early stages of development. These risks include, without limitation, competition, limited access to computational science and technology development experts, higher priced electricity, hardware and other necessary resources, among other factors. Specifically, we have not undertaken a study to determine the impact of our location in the context of the Filecoin Network marketplace.

We cannot guarantee that we will be successful in executing our business plan, achieving the expected results, and we may then be forced to cease operations, in which case we may be unable to repay the Loan and you will lose the Principal Amount and any accrued interest. Alternative networks providing similar services may be established and compete with the Filecoin Network and FIL.

**The Filecoin Network has limited history.**

The Filecoin Network is a relatively new network and has limited operating history. Each Note should be evaluated on the basis that the Company's or any third party's assessment of the prospects of the Project may not prove accurate, and that the Company will not achieve its investment objective. Past performance of the Company or any related entity, or any similar investment or Note, is not predictive of future results.

**There is limited or no control over the Filecoin Network.**

The Filecoin Network is based on open-source technologies that depend on a network of computers to run certain software programs to process transactions. There is limited control over the FIL and the Filecoin Network. FIL holders are not entitled to any of the rights of a stockholder of a company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

**FIL and the Filecoin Network may have a limited user-base.**

Nowadays many companies, including Amazon and Google, provide inexpensive, reliable, and friendly cloud storage services. The Filecoin Network may only be used by a modest number of persons, or there may be limited public interest in the Filecoin Network, and the development of distributed ecosystems more generally. Diminished user interest could negatively affect the development of the Filecoin Network and therefore the potential utility and value of FIL.

**The Company must pledge an amount of FIL commensurate with the storage space the Company provides to the Filecoin Network.**

A storage miner must make a commitment to offer a Sector (as defined below) to the Filecoin Network before it can accept storage orders. This commitment is made through a pledge transaction, which the storage miner submits to the Filecoin Network blockchain. The pledge consists of a deposit in the form of FIL, for the time that the service is intended to last, which is a function of the size of the Sector and the collateral. The Filecoin Network will return the collateral as long as the storage miner provides the required proofs of storage of the data it agreed to store, which are described in more detail below.

We have modeled our requirement to borrow FIL to pledge as collateral, and our expected maximum borrowing and rate of payment of interest and repayment of principal. We cannot assure Holders that our calculations are correct, or that we will effectively repay borrowed FIL to a FIL Supplier by the anticipated date.

While users of the Filecoin Network pay storage fees once the user and the miner enter into a deal, and the fees are automatically deposited into the miner's associated withdrawal wallet, the FIL is locked when received. As the storage miner renders the services to the user and provides the proofs requested by the Filecoin Network, the earned FIL is unlocked and is available for use, and thus for repayment to any FIL Supplier. In the event that for any reason earned FIL remains locked longer than anticipated, we will be unable to satisfy our financial obligations, including the payments required pursuant to the Note.

Our ability to make payments as expected will depend, among other factors, on our ability to successfully attract storage customers in the marketplace and to deliver the services accurately and in compliance with the Filecoin Network requirements.

**The Company has not entered into a Subordination Agreement with any FIL Supplier.**

The Company has certain repayment obligations incurred, and may seek additional financing, in the process of acquiring sufficient FIL for its pledge to launch operations of the Project, including with a third party FIL Supplier. As of the date of these Risk Factors, the Company has not entered into a Subordination Agreement with any FIL Supplier. Were the Company to become insolvent or subject to bankruptcy, the cash derived from the sale of our assets may be used first to repay any one or more FIL Suppliers, instead of the Series 1 Holders. The creditors, including Series 1 Holders may then share equally in the proceeds of sale any remaining assets (following payments of legal and other expenses incurred in the course of dissolution), and the Company may be unable to partially or fully repay your Loan.

**The Company may be penalized for its failure to provide proofs requested by the Filecoin Network.**

The Filecoin Network routinely confirms that the required proofs for each order exist and are valid, and will penalize a miner by taking part of its collateral if all or part of the proofs in relation to a piece of data are missing or invalid. This built-in disincentive is called "slashing", and aims to align the objectives of all the participants of the Filecoin Network. The collateral of a storage miner who removes data before a storage deal has expired or fails to provide a PoSt (as defined below) when requested, may be slashed. In the event that the Company fails to comply with the Filecoin Network

requirements, it may lose all or part of the collateral, which could materially and adversely affect the Company's abilities to satisfy its financial obligations including the Company's ability to make the payments under the Note.

**The Filecoin Network depends on novel proof systems which protect the integrity of the Filecoin Network.**

A decentralized storage network ("**DSN**") must protect data integrity and retrievability, so that the user receives the same data the user originally stored, as well as the user's uninterrupted ability retrieve the stored data. Some of the key challenges of a DSN are malicious miner attacks that exploit the network by receiving rewards without providing storage, ultimately rendering the network useless.

The Filecoin Network employs two novel consensus algorithms to verify that the user's data is continuously stored in the appropriate Sector. These are Proof-of-Replication ("**PoRep**") and Proof-of-Spacetime ("**PoSt**").

A "**Sector**" is a uniquely identified disk space which is a portion of the storage miner's storage space dedicated to the Filecoin Network. When a Sector is filled, the Sector is sealed. Once sealed, the storage miner must generate evidence to ensure the Filecoin Network and the community that the storage miner is storing the right set of data (which is a unique copy of the user's original data) in that same Sector. Those proofs constitute the PoRep, and the miner submits them to the public Filecoin Network blockchain.

To verify storage is continuous over time, the Filecoin Network uses PoSt. PoSt works by issuing challenges to randomly selected storage miners, who are required to provide PoRep of randomly selected Sectors that they maintain. The challenges are issued daily and must be responded to within a certain time limit. To correctly answer the challenges, the miner must have immediate access to the relevant Sectors.

While PoRep and PoSt are novel and useful mechanisms to safeguard the integrity of the Filecoin Network, they require significant computational resources. The Company may be adversely affected by its failure to timely and correctly provide PoRep and PoSt to the Filecoin Network, including by the Filecoin Network's slashing mechanism. If the Company continuously fails to provide satisfactory PoRep and PoSt, the Company may be banned from serving as a storage miner in the Filecoin Network. If the Company is banned, it will not be able to execute its business plan and we will be unable to repay your loan or make any payments under the Note.

**The Company may be adversely affected by the Filecoin Network's inability to satisfy data protection, security, privacy, and other government and industry-specific requirements.**

Security breaches and violations of data protection, privacy and other government and industry-specific requirements could harm the Filecoin Network's reputation, erode user confidence in the effectiveness of its security measures, negatively impact its ability to attract new users, or cause existing users to stop using the Filecoin Network. A decline in market acceptance and confidence in the Filecoin Network will affect the price of FIL and, as a result, hinder the Company's profitability.

DocuSign Envelope ID: 0453FF1A-804E-4CEB-AB20-475678EDCD9F

**The Filecoin Network protocol has an open-source structure and may be susceptible to contributions that could damage the Filecoin Network and could impact the use of the Filecoin Network and FIL.**

The Filecoin Network operates based on an open-source protocol, which due to its nature is not maintained or monitored by an official organization or authority, and thus it may be difficult to maintain or develop the Filecoin Network. Emerging issues or malicious programs may develop within the Filecoin Network, which may not be addressed adequately or in a timely manner. Third party contributors may introduce weaknesses or bugs into the core infrastructure elements of the Filecoin Network and open-source code which may negatively impact the Filecoin Network and, consequently, FIL. Such events may result in a loss of trust in the security and operation of the Filecoin Network and a decline in user activity. These events, in turn, could negatively impact the market price of FIL, and would negatively impact the Company's profitability.

**The further development and acceptance of blockchain networks, which are part of a new and rapidly changing industry, are subject to a variety of factors that are difficult to evaluate.**

The profitability of the Project is tied to the continued use and proliferation of the Filecoin Network, which is subject to a high degree of uncertainty. The factors affecting the further development of blockchain networks and cryptocurrencies, include, without limitation:

- worldwide growth in the adoption and use of cryptocurrencies and other blockchain technologies;

- government and quasi-government regulation of cryptocurrencies and other blockchain assets and their use, or restrictions on or regulation of access to and operation of blockchain networks or similar systems;

- the maintenance and development of the open-source software protocol of cryptocurrency networks;

- changes in consumer demographics and public tastes and preferences;

- the availability and popularity of other forms or methods of buying and selling goods and services, or trading assets including new means of using government-backed currencies or existing networks;

- general economic conditions and the regulatory environment relating to cryptocurrencies; and

- a decline in the popularity or acceptance of cryptocurrencies or other blockchain-based tokens that would adversely affect the Company's business and results of operations.

The cryptocurrency and blockchain industries as a whole have been characterized by rapid changes and innovations and are constantly evolving. Although they have experienced significant growth in recent years, the slowing or stopping of the development, general acceptance and adoption and usage of blockchain networks and blockchain assets may materially and adversely affect the Project's revenue generating potential. Finally, the Company can give no assurance that technical advances, such as the development of quantum computing, will not present challenges to blockchain technology by rendering ineffective the cryptographic consensus mechanisms that underpin blockchain protocols.

**The Company's revenue would be adversely affected by declining prices of FIL.**

The price of and demand for digital assets, including FIL, have historically been subject to uncertainty and volatility. Price and demand for digital assets, including FIL, depend on numerous factors, including:

•   Changes in liquidity, market-making volume, and trading activities;

•   Speed and rate at which digital assets, including FIL, are adopted as a medium of exchange;

•   Market conditions across the financial system built upon cryptography-based networks and protocols (the "**Cryptoeconomy**");

•   Regulatory or legislative changes and updates affecting the Cryptoeconomy;

•   Characterization of digital assets, including FIL, under the laws of various jurisdictions;

•   Consumer preferences and perceived value of digital assets, including FIL, and markets;

•   Investment and trading activities of highly active retail and institutional users, speculators, miners, and investors;

•   Maintenance, troubleshooting, and development of the blockchain networks underlying digital assets, including the Filecoin Network, by miners, validators, developers and other actors in the Cryptoeconomy around the world;

•   Ability for crypto networks, including the Filecoin Network, to attract and retain miners to provide storage, retrieve data, and validate and authorize transactions accurately and efficiently; and,

•   Liquidity of digital asset platforms.

There is no assurance that FIL will maintain its value or that there will be meaningful levels of trading activities. In the event that the price of FIL or the demand for the Filecoin Network and trading FIL decline, the Company's revenue would be adversely affected.

**FIL pricing is volatile.**

The Company plans to mine FIL and then batch liquidate it through such means and on such terms and timing as the Manager deems appropriate. The determination as to optimal timing involves some degree of speculation as to the right time to sell FIL on capital markets. There could be instances in which FIL is sold at a loss. To mitigate against this risk, the Company may, at times, purchase futures contracts to hedge against FIL pricing. Nevertheless, there is a risk of loss in value of the FIL assets due to the pricing volatility and, hence, a risk that revenue generated by the Company's mining operations will, at times, be lower than anticipated.

**FIL custodial arrangements may be hacked.**

There is a custodial risk associated with FIL mining rewards. A hot wallet maintained by the Company could be hacked, and a cold wallet maintained by the Company could be stolen, lost or destroyed, in either case resulting in loss of access to the FIL mining rewards to which the wallets correspond and hence, loss of value of Company assets. Similarly, a best-in-class third-party custody arrangement such as one offered by Coinbase Custody or BitGo Custody is nevertheless susceptible to hacking or network penetration, again resulting in loss of access to the FIL assets, and hence, loss of value of Company assets. If FIL assets are lost prior to liquidation, it will result in overall loss of revenue from the Company's mining operations, which could have a material adverse effect on the repayments received by Holder.

**There is significant unfamiliarity and negative publicity associated with digital asset and blockchain-backed platforms.**

Digital asset platforms are relatively new. Some actors operate within the space without supervision from any governmental authority, and fail to provide the public with material information regarding their ownership structure, corporate policies and practices, or regulatory compliance. Investors and the general public may lose confidence in digital asset platforms, whether or not they are regulated, as a consequence of such negative publicity and lack of familiarity with the space. Such loss of confidence may affect the value of FIL, the Filecoin Network and, as result, of the Company's investment in the Project.

**The Company may not be able to procure mining equipment.**

The Company plans to acquire its mining hardware either directly or indirectly from third party manufacturers (the "**Suppliers**"). The Company will be procuring certain mining hardware from Suppliers at a total cost of around US$2,000,000. Approximately US$800,000 are due on or before the May 21, 2021. The remainder of the purchase price is due upon release from the Suppliers, which is estimated to be in May 21, 2021.

There is a risk that the Company will be unable to raise enough funds necessary to finance the full amounts of payments owed to the Suppliers for the mining hardware, which could result in forfeiture of the initial payments, litigation by the Suppliers for breach of contract, or a smaller number of FIL or fiat currency being delivered in an amount proportionate to the payment made. If litigation takes place between the Company and the Suppliers, it may take place outside of the United States, which presents the risk of higher litigation expenses. There is a risk that the Suppliers will go out of business before the mining hardware is shipped. There is a risk that some or all of the mining hardware will be defective or nonconforming. There is a risk that shipment of some or all of the mining hardware will be delayed due to circumstances beyond the Company's control, such as disruption of the Suppliers' supply chain, problems with shipping, or other *force majeure* events. If the full quantity of mining hardware is not shipped, or shipment is delayed, or if some equipment needs to be returned, it will negatively impact the Company's revenue and anticipated financial performance. Lastly, there is a risk that the agreement for the Company's purchase of the mining hardware will either fail to be executed, or fail to be negotiated on optimal terms, which would have a material adverse effect on the Company's ability to procure the quantity of equipment planned, and a material adverse effect on the Company's revenue and anticipated financial performance.

**The Company's mining hardware may suffer damage, become obsolete, be stolen or damaged, or lose its warranty.**

The Company's mining hardware will be heavily dependent on the continuous and efficient operation of the equipment and servers that will be located at the Company's premises. There is a risk that a power surge, severe storm or other inclement weather event, a fire that activates the sprinkler system at the premises, a flood, a partial or complete collapse of the structure, or mistakes made by Company personnel, would result in damage to the Company's mining equipment. If any such damage occurs, it will result in one or more miners becoming disabled or "offline," which will in turn affect the Company's ability to operate efficiently and profitably. Although disabled or damaged miners can be replaced, the delay in procuring and bringing new equipment online will still negatively impact revenue generated by the Company's mining operations.

The Company anticipates that the mining equipment it has ordered will be productive for several years. However, newer FIL storage mining technology will eventually become available that will render the Company's mining equipment obsolete. The Company cannot predict how quickly advances in technology will happen. There is a risk that the Company's mining equipment will become obsolete sooner than expected and require upgrades or replacements. Under such circumstances, the costs associated with such upgrades or replacements will adversely affect the Company's profitability.

There is a risk of loss on account of vandalism or theft. The Company's facility and the equipment located there could be damaged on account of vandalism. In addition, there is a risk that one or more of the miners or other equipment could be stolen. If any such theft or vandalism occurs, it will result in diminished mining capacity until such time as the damaged or stolen equipment can be repaired or replaced. The diminished capacity will result in revenue reduction and increase the difficulty in operating the Company efficiently and profitably.

**Electrical Service to the Project location may be interrupted.**

The Company's storage mining operations will be heavily dependent on a continuous supply of large amounts of electricity to the premises. There is a risk that this supply may be disrupted. Such disruption can be caused by utility company transmission equipment downtime due to maintenance or equipment failure. Such disruption can also be caused by adverse weather conditions, strikes, lockouts, labor shortages, or other *force majeure* events. Disruption of electrical service to the premises could result in disruption to the Company's storage mining operations and affect the Company's ability to operate efficiently and profitably.

**Internet access to the Project location by be disrupted.**

The Company's storage mining operations will be heavily dependent on continuous high-speed broad-band Internet access. There is a risk that this access may be disrupted. Such disruption can be caused by Internet service provider equipment downtime due to maintenance or equipment failure. Such disruption can also be caused by adverse weather conditions, strikes, lockouts, labor shortages, or other *force majeure* events. Disruption of high-speed broad-band Internet access to the premises will result

in disruption to the Company's storage mining operations and affect the Company's ability to operate efficiently and profitably.

**The Project may require additional capital which might not be available on acceptable terms, or at all.**

In the event that the Project requires additional capital, we would need to facilitate an infusion of equity or obtain debt financing. We cannot assure you that either option would be available on commercially reasonable terms or at all. Financial market disruption, the ability to attract business partners and financiers, and general economic conditions in which the credit markets are severely constrained may make it difficult for us to obtain additional financing on terms favorable to us, if at all. Any debt financing secured by us in the future could involve restrictive covenants relating to our capital raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue business opportunities. If we are unable to obtain adequate financing, or financing on terms satisfactory to us, when we require it, our ability to continue to support the growth of our business and to respond to business challenges could be significantly impaired. If we are unsuccessful in raising capital when needed, you could lose your entire Principal Amount and any accrued interest. Any additional debt financing will restraint our cash flow, and thus our ability to satisfy our obligations as they become due.

**The Holder's security interest in the Company's assets is not perfected.**

By entering into the Note, the Holder will acquire a security interest in all of the assets that the Company owns or will own, as well as all accessions, additions and improvements to, and all proceeds and products of, such assets. The security interest secures your payment under the Note.

The security interest will not be perfected. The perfection of a security interest puts third parties on notice of its existence. Third parties who are unaware of your security interest may in turn enter into agreements with the Company and also acquire security interests on the same assets, as collateral for their payments.  If we enter into other agreements, including with a FIL Supplier, whereby we grant a security interest on Company's assets and such interest is perfected, your ability to enforce the security interest in an insolvency proceeding would be limited and the Company's assets may not be available to secure your repayment.

**The Company's assets may not be insured.**

The assets of the Company are not insured by any government insurer except to the extent portions may be deposited in bank accounts insured by the Federal Deposit Insurance Corporation or with brokers insured by the Securities Subscriber Protection Corporation and such deposits and securities are subject to such insurance coverage.

**The Company's Manager intends to develop and operate additional FIL mining projects in respect of which the Holder has no interest, and which may distract the Manager from focusing on the Project.**

The Project is the first of what the Manager expects will be several projects that implement the same business model in respect of using FIL storage mining as a method for profiting from the availability of storage hardware and space. We expect that subsequent projects will be significantly larger than the Project and will require significantly more time and financial resources than the Project. We cannot

DocuSign Envelope ID: 0453FF1A-804E-4CEB-AB20-475678EDCD9F

assure you that the Manager will provide sufficient attention to the ongoing operation of the Project once other larger projects are on line.

**Our risk management efforts may not be effective which could result in unforeseen losses.**

We could incur substantial losses and our business operations could be disrupted if we are unable to effectively identify, manage, monitor, and mitigate financial risks, such as credit risk, interest rate risk, prepayment risk, liquidity risk, regulatory risk, and other market-related risks, as well as operational risks related to the Project. Our risk management policies, procedures, and techniques may not be sufficient to identify all of the risks to which we may be exposed, mitigate the risks that we have identified or identify additional risks to which we may be subject in the future.

**The Project may be negatively impacted by the coronavirus outbreak.**

In December 2019, the 2019 novel coronavirus surfaced in Wuhan, China. The World Health Organization declared a global emergency on January 30, 2020, due to the outbreak. To this date, while massive vaccination plans are underway in many regions, several countries are still implementing travel and mobility restrictions, as they continue to see significant spikes in the number of coronavirus cases. The impacts of new outbreaks of the coronavirus are unknown and rapidly evolving. A continued widespread health crisis could hinder the improvement of the global economy, resulting in a renewed economic downturn that could impact demand. The future impact of the coronavirus is highly uncertain and cannot be predicted and there is no assurance that the outbreak will continue to decrease, and not have a material adverse impact on the future results of the Company. The extent of the impact, if any, will depend on future developments, including actions taken to contain the coronavirus around the world.

**Risks related to litigation.**

We may be subject to different types of litigation. Whether or not the litigation has merit, it could be time consuming and expensive for us and divert the attention of our management and other personnel from other work.

**Tax Risks Generally.**

There are a number of federal income tax risks relating to the business of the Company and lending to the Company that could impact the advisability of any prospective lender lending to the Company. No rulings have been sought from the Internal Revenue Service ("**IRS**") with respect to any of the tax matters referenced herein, and you should consult your own tax advisor as to the relevant tax considerations and as to how those considerations may affect your Loan, and to determine whether lending to the Company is suitable for you.

The Series 1 Notes are structured debt instruments; however, we cannot assure you that the IRS or any other governmental authority will respect such characterization. The tax characterization of the Note is uncertain, and each Holder must seek its own tax advice in connection with a loan to Company evidenced by a Note. A loan evidenced by a Note may result in adverse tax consequences to Holder, including withholding taxes, income taxes and tax reporting requirements. In the event that the Series 1 Notes were considered to be equity or commercial royalty obligations, the tax treatment for both the Company and for you may be materially different. A change in tax characterization could result in taxation of Company revenue as profit at the Company and subsequent taxation of the Company's

payments to the Series 1 Holders as if they were dividends. Payment of additional taxes would materially and adversely affect (or eliminate) the return on your Loan. Each Holder should consult with and must rely upon the advice of its own professional tax advisors with respect to the United States and non-U.S. tax treatment of a Loan.

**Information technology system failures or breaches of our network security could interrupt Project implementation or operations and adversely affect the Project's results of operations.**

The implementation and operation of the Project will depend upon protection of Project infrastructure, including computer equipment and systems, against damage from physical theft, fire, power loss, telecommunications failure or other catastrophic events, as well as from internal and external security breaches, viruses and other disruptive problems. Any damage or failure of computer systems or network infrastructure that causes an interruption in Project operations could have a material adverse effect on the Project's ability to successfully generate revenue. The Project will need to continually upgrade its technological capabilities to stay competitive. It is not unusual for there to be a shortage in availability of state-of-the-art computer resources. We cannot assure that a failure to successfully manage our information technology systems will not result in a decrease in or loss of our ability to generate revenue from which to pay our creditors.

**To the extent that the profit margins of FIL mining operations are not high, operators of FIL mining operations are more likely to immediately sell FIL earned by mining in the market, resulting in a reduction in the price of FIL that could adversely impact the Company, and similar actions could affect other cryptocurrencies.**

Professionalized FIL storage mining operations may use proprietary hardware or sophisticated hardware acquired from manufacturers. They require the investment of significant capital for the acquisition of this hardware, the leasing of operating space (often in data centers or warehousing facilities), incurring of electricity costs and the employment of technicians. As a result, professionalized mining operations are of a greater scale than prior miners and have more defined, regular expenses and liabilities. These regular expenses and liabilities require professionalized mining operations to more immediately sell awards earned from mining operations, whereas it is believed that individual miners in past years were more likely to hold newly mined digital assets for more extended periods. The immediate selling of newly mined FIL greatly increases the supply of tokens, creating downward pressure on the price of FIL. The extent to which the value of tokens mined by a professionalized mining operation exceeds the allocable capital and operating costs determines the profit margin of such operation. A professionalized mining operation may be more likely to sell a higher percentage of its newly mined tokens rapidly if it is operating at a low profit margin—and it may partially or completely cease operations if its profit margin is negative. In a low profit-margin environment, a higher percentage could be sold more rapidly, thereby potentially reducing token prices. Lower token prices could result in further tightening of profit margins, particularly for professionalized mining operations with higher costs and more limited capital reserves, creating a network effect that may further reduce the price of the token until mining operations with higher operating costs become unprofitable and remove mining power. The network effect of reduced profit margins resulting in greater sales of newly mined tokens could result in a reduction in the price of tokens that could adversely impact the Company.

The foregoing risks associated with FIL could be equally applicable to other cryptocurrencies, existing now or introduced in the future. Such circumstances would have a material adverse effect on the Project as a going concern.

**Stolen or incorrectly transferred digital assets may be irretrievable.**

Once a transaction has been verified and recorded in a block that is added to the blockchain, an incorrect transfer of digital assets or a theft of digital assets generally will not be reversible, and the Company may not be capable of seeking compensation for any such transfer or theft. It is possible that, through computer or human error, or through theft or criminal action, the Company's digital assets could be transferred in incorrect amounts or to unauthorized third parties. To the extent that the Company is unable to seek a corrective transaction with such third party or is incapable of identifying the third party which has received the Company's digital assets through error or theft, the Company will be unable to revert or otherwise recover incorrectly transferred digital assets. To the extent that the Company is unable to seek redress for such error or theft, such loss could adversely affect the repayment of your Loan by the Company.

If rewards and transaction fees are not properly matched to the efforts of miners, miners may not have an adequate incentive to continue mining. Miners ceasing operations could reduce the collective processing power on the Filecoin Network, adversely affect the available storage space for end-users, and, generally, make the network less attractive.

**Political or economic crises may motivate large-scale sales of FIL or other cryptocurrencies, which could result in a reduction in value and adversely affect the Company.**

As an alternative to fiat currencies that are backed by central governments, digital assets such as FIL, Bitcoin and Ethereum, which are relatively new, are subject to supply and demand forces based upon the desirability of an alternative, decentralized means of buying and selling goods and services, and it is unclear how such supply and demand will be impacted by geopolitical events. Nevertheless, political or economic crises may motivate large-scale acquisitions or sales of FIL, Bitcoin and Ethereum and other cryptocurrencies either globally or locally. Large-scale sales of FIL, Bitcoin and Ethereum or other cryptocurrencies would result in a reduction in their value and could adversely affect the Company. Such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue the Project at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm Series 1 Holders.

**It may be illegal now, or in the future, to acquire, own, hold, sell or use FIL, Bitcoin, Ethereum, or other cryptocurrencies, participate in the blockchain or utilize similar digital assets in one or more countries, the ruling of which would adversely affect the Company.**

Although currently FIL, Bitcoin, Ethereum, and other cryptocurrencies, the blockchain and digital assets generally are not regulated or are lightly regulated in most countries, including the United States, one or more countries such as China and Russia may take regulatory actions in the future that could severely restrict the right to acquire, own, hold, sell or use these digital assets or to exchange for fiat currency. Such restrictions may adversely affect the Company. Such circumstances would have a material adverse effect on the ability of the Project to continue as a going concern.

**Series 1 Holders must undertake their own due diligence**.

While we believe the information contained on the materials provided to you in relation to our business plan is accurate, such materials were not meant to contain an exhaustive summary of all relevant facts

DocuSign Envelope ID: 0453FF1A-804E-4CEB-AB20-475678EDCD9F

pertaining to our Company. As a result, you are required to undertake you own due diligence of the Company, its current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information you have been provided. **This structured debt instrument is suitable only for creditors who have the knowledge and experience to independently evaluate our Company, our business and prospects.**

**The Series 1 Notes are subject to transfer restrictions.**

Our Company's securities, including the Series 1 Notes, should be considered a long-term, illiquid investment. The Series 1 Notes have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), and cannot be sold without registration under the Securities Act or an exemption from registration. In addition, the Series 1 Notes are not registered under any state securities laws that would permit their transfer. Additionally, the Series 1 Notes place restrictions (or outright prohibition) on their transfer. Even were a transfer of the Note to be approved, there is no active trading market. As a result, Holder will be required to hold its Note until the earlier of the maturity date, the termination of the Note as set forth therein, and until Holder complies with the transfer requirements set forth in the Note. Holder must be prepared to bear the risk of a loan to the Company under the Note until the termination of the Note pursuant to its terms. Only accredited investors or institutions that can tolerate an almost complete lack of liquidity should lend funds to the Company.

**Series 1 Holders may lack information for monitoring the repayment of their Loans.**

The Holder may not be able to obtain all information it would want regarding the Company, the Project, FIL, or the Filecoin Network, on a timely basis or at all. It is possible that the Holder may not be aware on a timely basis of material adverse changes that have occurred with respect to certain investments.

**We have not retained independent professionals for Series 1 Holders.**

We have not retained any independent professionals to comment on or otherwise protect the interests of potential creditors. Although we have retained our own counsel, neither such counsel nor any other independent professionals have made any examination of any factual matters herein, and you should not rely on our counsel regarding any matters herein described.

**Suitability Requirements.**

The Series 1 Notes are being issued only to accredited investors who meet certain suitability requirements. The fact that you meet the suitability requirements established by us does not necessarily mean that making a loan to our Company is suitable for you. You should consult with your own professional legal, accounting and tax advisers before entering into a Note. You should be aware that we will assert that you consented to the risks described herein if you bring a claim against us or any of our respective managers, employees, advisors, agents, or representatives.

# File Storage Ops 1, LLC- Payment Information

**<u>Wiring Instructions:</u>**

Receiving Bank: PlainsCapital Bank

Receiving Bank Address: 201 W 5th Street, Suite 100 Austin, Texas 78701

Routing Number: 111322994

Swift Code (receiving international wires): PLASUS44

Beneficiary Name: File Storage Ops 1, LLC

Beneficiary Address: 8 The Green Suite R Dover, DE 19901

Beneficiary Account Number: 7317368104