**UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FILE STORAGE PARTNERS, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11 (Subchapter V)<br><br>Case No. 23-10877 (CTG)<br>(Jointly Administered)<br><br><u>**Related D.I.**</u>: 8, 49, 50, 63, 65, 70, 72 |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF MOTION OF DEBTORS FOR
ENTRY OF AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND
INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
<u>CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF</u>**

The above-captioned Debtors hereby submit this reply (the "<u>Reply</u>") in support of the *Motion of Debtors for Entry of an Order (A) Approving the Sale of Substantially all Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [D.I. 8] (the "<u>Sale Motion</u>") and in response to the objections to the Sale Motion filed by (a) the Ad Hoc Noteholder Group ("<u>AHNG</u>") [D.I. 49 & 65] (as originally filed at D.I. 49, the "<u>Original AHNG Objection</u>," as amended at D.I. 65, the "<u>Amended AHNG Objection</u>", and collectively, the "<u>AHNG Objections</u>"), (b) BitTx Hold, LLC along with certain of its affiliates including D Ledger Partners LLC ("<u>BitTx</u>") [D.I. 70] (the "<u>BitTx Objection</u>,"); (c) Thomas Hessler ("<u>Hessler</u>") [D.I. 72] (the "<u>Hessler Joinder</u>," and together with the AHNG and BitTx Objections, the "<u>Noteholder Objections</u>," with the Parties seeking the same, the "<u>Noteholder Objectors</u>"); and (d) LightEdge Solutions, LLC ("<u>Lightedge</u>") [D.I. 50] (the "<u>Lightedge Objection</u>," and together with the Noteholder Objections, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842). The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

"Objections," with the parties asserting the same the "Objectors"). In support of this Reply, the Debtors rely upon and fully incorporate the Declarations[2] and respectfully represent as follows:

## Preliminary Statement

As the Debtors have discussed and previously testified to on a number of occasions in these cases, their decision to seek a sale of their assets through a bankruptcy forum did not come lightly, and certainly did not come without having exhausted every other option they had available to them. Indeed, that reality was as true on a prepetition basis as it has been since the cases were filed. The only distinction since the Petition Date is that more parties have surfaced with an interest in the Debtors' assets, even if some of those were the same parties that were approached prepetition. While the level of interest has been a welcome surprise to the Debtors, it was nonetheless the intent (with the blessing of the Subchapter V Trustee) behind serving the Debtors' sale papers on any and all of the investors in the various non-Debtor File Storage Ops and affiliated entities.

As a result of the increased attention the Debtors have experienced since serving the Sale Motion on July 11, 2023, they have pivoted their approach to accommodate this change of circumstances while still attempting to comply with the limitations of the timeline and funding that they have available to them. In so doing, many of the Noteholder Objections have likely been mooted (in which case this Reply is filed out of an abundance of caution); to name just a few of the Debtors' actions: (i) all interested parties that have surfaced since July 11th have been given the opportunity to sign an NDA and access the Debtors' data room ("Data Room"); (ii) the

---

[2] The Declarations are the *Declaration of Timothy Furey, Chief Restructuring Officer of the Debtors, in Support of the Debtors' First Day Motions* [D.I. 10] (the "Original Declaration"), the *Supplemental First Day Declaration of Timothy Furey, Chief Restructuring Officer of the Debtors, in Support of the Debtors' First Day Motions* [D.I. 18] (the "First Supplemental Declaration,"), *Supplemental Declaration of Timothy Furey, Chief Restructuring Officer of the Debtors, in Support of the Debtors' DIP Motion and Reply to Objection of Ad Hoc Noteholder Group to Entry of the Final DIP Order* (the "Final DIP Declaration"), and the *Declaration of Timothy Furey, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Sale Motion* (the "Sale Declaration") filed concurrently herewith.

2

Debtors' professionals and personnel have engaged in dozens of video, telephonic, and email correspondences with such parties, to say nothing of orchestrating site visits to the two primary locations where the Debtors' assets reside; (iii) the Debtors hosted a "town hall" telephonic meeting on August 10, 2023, at which all parties subject to an NDA were invited to attend in order to gather further due diligence above and beyond anything previously asked; (iv) in consultation with the U.S. Trustee, Subchapter V Trustee, and the Noteholder Objectors, the Debtors pushed the Sale Hearing from what was originally August 1st all the way to August 17th in order to allow for further diligence and participation in an auction process (if needed) on August 16th; and (v) invited all such NDA parties to submit higher and better offers than the proposed purchaser in the Sale Motion ("Proposed Purchaser"), with said solicitation reflected, *inter alia*, through the issuance of sale notices docketed at D.I. 87 and 94 (the "Sale Notices"). Sale Declaration, ¶ 4. As of the time of this Reply, it is the Debtors' understanding that at least one interested party other than the Proposed Purchaser may submit such an offer by the August 15th deadline for doing so, in which case the Debtors are planning for a transcribed auction the following day (if no other offers are received, then no auction will be held). *See* Sale Notices. The Debtors anticipate notifying parties no later than the evening of August 16th as to the ultimate winning bid. *Id.*

While it is true this process did not involve the engagement of an investment banker or as long of a window as at least certain parties might have preferred, the Debtors strongly maintain that given the facts, circumstances, and constraints of this particular case, all parties with a legitimate, realistic interest in the Debtors' assets had a fair and meaningful opportunity to participate. At bottom, the Noteholder Objectors have had the Sale Motion in hand since at least July 11th, nearly forty days prior to the Sale Hearing; there is simply no evidence that any longer of a window would have generated any additional interest, but regardless, the Noteholder

3

Objectors cannot say they had inadequate time to bring forth a proposal. The Debtors thus ask that the Noteholder Objections be overruled and that an order approving the sale be entered consistent with the results of the August 16th auction (or if none, approving the sale to the Proposed Purchaser).

**Reply**

1. As an initial matter, it is important to frame the sale contemplated by the Sale Motion. As noted in the APA, the Debtors seek to assign any of the Debtors' interests in their assets as used in the conduct of their operations (as more fully set forth in the APA, "Assets"). *See* D.I. 8-1, APA § 2.1. The sale as contemplated is on an "As is/Where is." *Id.* at § 3.3. Except for the representations and warranties expressly set forth in the APA's Article III, the Debtors disclaim any other representations or warranties with respect to the Debtors, their Business (as defined in the APA), the assets, or any of the transactions contemplated by the APA. *Id.* at § 3.14. As previously disclosed in their Statement of Financial Affairs ("SOFA"), the Debtors have not conducted a full inventory of their assets and thus may not be able to immediately verify the quality, status, or possession of a particular asset. *See* SOFA, p. 12. For the avoidance of doubt, both the APA and the Proposed Purchaser's bid are included in the Data Room for parties to review.

2. As previously disclosed, the Debtors served the Sale Motion on an expansive list, including parties that previously served as investors in certain non-Debtor affiliate entities (such as the Noteholder Objectors). *See* Sale Motion Certificate of Service, D.I. 34. Since serving the Sale Motion, the Debtors received outreach from several parties who wished to gain more information on the Assets and/or conduct due diligence on the same for the purposes of potentially submitting a purchase offer. Sale Declaration, ¶ 6. To accommodate that interest, the Debtors

permitted them to access the Data Room (after signing a Non-Disclosure Agreement ("NDA")) that included information available to Proposed Purchaser, in addition to other relevant documents.[3] *Id.* The Debtors also hosted a "Town Hall" style management presentation on August 10, in which undersigned counsel and the Debtors' CRO addressed in a public forum (made available to NDA parties) various questions they had as to due diligence and the sale process.[4] *Id.*

3. In total, seven different entities signed NDAs, including Hessler and BitTx; the AHNG did not sign an NDA, although two of its members did in their individual capacity, both of whom are purportedly not represented by the AHNG's counsel. Sale Declaration, ¶ 7. In addition to the two Noteholder Objectors and the two AHNG members, the NDA parties consisted of two other parties in the Web3 space as well as one of the Debtors' former Filecoin lenders. *Id.* In addition, at least one NDA party conducted a site visit at Lightedge's facilities, where the assets reside. *Id.*

4. As noted *supra*, mostly prior to undergoing the diligence process referenced above, the Debtors received the sale Objections. There are certain commonalities throughout the Objections in addition to certain idiosyncrasies in each. Again, to the extent the Objections are still extant (in whole or in part), the Debtors request that the Objections be overruled or addressed as proposed herein, for the reasons set forth below.

I. **SALE OBJECTIONS**

A. *AHNG Objections*

---

[3] Among many other things, the Data Room has been populated with the information in the Debtors' possession regarding the purchase and acquisition of the Assets (including but not limited to a detailed spreadsheet and the upload of invoices comprising the same), critical filings in these cases, as well as a "roadmap" document that directs parties where to find certain important, oft-requested pieces of information. Sale Declaration, ¶ 6 n. 4. The Debtors have continued to update the Data Room on a rolling basis as additional generic requests come in. *Id.*

[4] In addition, on August 8, 2023, the U.S. Trustee conducted its 341 Meeting of the creditors, at which time the Debtors' CRO testified and answered questions raised by creditors attending the same (including some of the Noteholder Objectors).

5

5. The vast majority of the AHNG's objections to the Sale Motion are largely moot as will be addressed *infra*. As an initial matter, however, and as originally detailed in the *Debtors' Reply to Objection of Ad Hoc Noteholder Group to Entry of the Final DIP Order* [D.I. 62] ("DIP Reply"), it is impossible to overlook the procedural deficiencies that pervade the AHNG Objections, the first of which was filed July 25, 2023. For the avoidance of repetition, the Debtors incorporate the DIP Reply by reference, especially via paragraph 2 through 6. Suffice it to say, the Original AHNG Objection (i) cited to non-existent portions of the agreement that purportedly gave them rights against the Debtors; (ii) failed to attach the agreement at all; and (iii) pointedly failed to disclose under Bankruptcy Rule 2019 the members of the purported group until three days *after* the Original AHNG Objection was filed, and only *after* the Debtors' DIP Reply had been filed.[5] This effective weaponization of and failure to comply with Bankruptcy Rule 2019 carries with it serious repercussions, of course, including striking pleadings that are filed by the purported group or refusing to let them be heard in the case. *See* Bankruptcy Rule 2019(e)(2)(A)-(C).

6. To the Debtors' surprise, the AHNG then doubled down on their procedural disregard by filing the Amended AHNG Objection on July 28, 2023—a full *three* days after the objection deadline had expired for both the DIP and the Sale Motions. The AHNG filed the belated pleading having neither sought nor received leave of the Court or even advising the Debtors of their intent to do so, and all this despite adding numerous substantive arguments and factual statements (apparently as a means of asserting arguments that it wished it had in the first place). The AHNG attaches no blackline of their purported "amended" objection, leaving the Court, the Debtors, and all other parties-in-interest to cipher through the changes if not the overall purpose

---

[5] As further noted in the DIP Reply, Debtors' counsel and DIP Lender's counsel had repeatedly asked the AHNG's counsel for this information as well prior to the Original AHNG Objection, without success.

6

of the pleading. As noted above, it was also only at this point that the AHNG filed their 2019 statement, three days after the applicable objection deadlines and a day after the DIP Reply.

7. Taken as a whole, it is clearly appropriate for the Court to disregard the AHNG Objections in their entirety. If not through the plain breach of the objection deadlines or failure to seek leave to advance new arguments under the guise of an "amended" pleading, then Bankruptcy Rule 2019 permits the Court, when faced with a party who has failed to comply with that rule, to "refuse to permit the . . . group, or committee to be heard or to intervene in the case; [or] hold invalid any . . . objection given . . . by the . . . group, or committee." Bankruptcy Rule 2019(e)(2)(A), (B). This is a prime case for employing such authority.

8. Regardless of their procedural infirmities, the AHNG Objections fare no better on substance. In the first instance, much of the AHNG Objections has been mooted based on developments since the time of their filing. For instance, the AHNG Objections claim that the Debtors' sale process (i) is too fast, (ii) does not consider the ability of other parties to participate in the process beyond the Proposed Purchaser, and (iii) does not allow for due diligence. On the first point, the Debtors have already extended the sale hearing from August 1st to August 17th, with closing scheduled for no later than August 31, 2023; this effectively means that the AHNG will have had nearly forty days since receiving the Sale Motion—well in excess of the statutory minimum under the Bankruptcy Rules—to convey any interest in the process, and nearly fifty-four days by the time of closing. While not the additional sixty days the AHNG seeks, it is more than sufficient for parties to participate given the limited funding and size of these particular cases, especially considering the AHNG's knowledge of these companies' distress well prior to the Petition Date, as noted below.

9. Notably, further extending the process beyond its current endpoint ignores several other realities of these cases—(i) the Debtors have experienced attrition to the already miniscule workforce that services the Debtors' operations, with two individuals having already resigned since the Petition Date; (ii) relatedly, the last funding for what personnel remains under the DIP Budget is for the week ending August 18, 2023—further delay risks the possibility that the remaining personnel will be uncompensated and significantly jeopardizes the likelihood that they continue in the Debtors' service at all; and (iii) the ongoing cases have caused other parties critical to the Debtors' operations to cease providing services, namely one of its Filecoin lenders, Darma Capital ("Darma")—Darma, on the argument that it is a federally regulated swaps dealer and thus excepted from the bounds of the automatic stay, summarily terminated its services to the Debtors earlier this month.[6] Sale Declaration, ¶ 10. All this is to highlight the existential risks these companies face the longer their proposed sale process remains unresolved.

10. Secondly, the Debtors have unquestionably encouraged and embraced the interest shown by other parties since the Sale Motion was served; indeed, in consultation with the Subchapter V Trustee from the very first days of these cases, one of the primary reasons for serving the Sale Motion on all investors in the non-Debtor affiliates was to make them aware of the sale and these cases, despite the prepetition outreach they had already made. Since that time, the Debtors have spoken with, provided NDAs to, and otherwise assisted a number of such parties in their due diligence inquiries (Sale Declaration, ¶ 11); ironically, neither the AHNG itself nor its counsel has ever signed an NDA, although two of its members have individually done so.[7] The Data Room made available to all NDA parties has been populated with dozens of documents, well

---

[6] Had the sale hearing proceeded on its initially scheduled track—August 1st— the impetus for this termination may not have presented itself or at least its impact mitigated.
[7] Counsel to the AHNG has advised that it does not represent those parties in their individual capacity.

beyond those that Proposed Purchaser had originally requested prepetition. Sale Declaration, ¶ 11. Finally, it is the Debtors' understanding that the Proposed Purchaser itself has made itself readily and openly available to the Noteholder Objectors, including directly reaching out to the same; point being, this is not a situation where a buyer has attempted to stonewall any sort of inquiries into the transaction which it originally sought to execute.

11. Beyond that, after having discussed with the U.S. Trustee, Subchapter V Trustee, and counsel/representatives of the Noteholder Objectors, the Debtors arranged for a process through which higher and better offers would be solicited and, if received, a virtual auction would be held.[8] This process is reflected in the Sale Notices, which were served on all parties who received the Sale Motion as well as those who signed NDAs. *See* Sale Notices Certificates of Service, D.I. 93, 95. That process was further discussed at the "Town Hall" telephonic meeting hosted by the Debtors on August 10, 2023, which was made available to all parties that signed an NDA.[9]

12. The AHNG also complains that the companies were not sufficiently marketed prepetition.[10] Again, as set forth in the DIP Reply and supported by the Final DIP Declaration, the Debtors in fact made extensive outreach to a host of different parties in trying to find a solution to their financial distress. Sale Declaration, ¶ 13. This included exploring loans, equity investments, and outright sales of their equipment; perhaps more importantly, it involved dialogues with the Noteholder Objectors here. *See* Final DIP Declaration, ¶¶ 5-10; Sale Declaration, ¶ 13. None of those options proved viable. Ultimately, the AHNG's complaint on this point is simply off the

---

[8] To be clear, the Noteholder Objectors reserved their rights with respect to process arguments.
[9] Despite not signing an NDA, the Debtors permitted counsel to the AHNG to attend this meeting, with all Debtors' rights reserved.
[10] Somewhat contradictorily, the AHNG Objections concede that the Debtors did in fact attempt a prepetition restructuring. *See* AHNG Objections, ¶10.

9

mark as it ignores the months of advance notice they had regarding the Debtors' dire conditions, to say nothing of the fact that their argument is unsupported by any evidence.

13. In sum, the AHNG Objections are riddled with unexplained procedural and substantive deficiencies, either of which are grounds to overrule the same. The Debtors request that the Court do so here.

B. *BitTx Objection*

14. As with the AHNG Objections, it appears that much of the BitTx Objection has been rendered moot given the current status of these cases. Indeed, the core of what BitTx is seeking is an additional seven days to complete diligence to submit an offer (*see* BitTx Objection, ¶ 29); it has received that. In fact, BitTx has had the benefit of at least sixteen additional days if measured by the delay of the Sale Hearing from August 1st to August 17th. Moreover, BitTx has (i) had full access to the Debtors' Data Room, (ii) sent and received numerous requests with the Debtors for information and disclosures, and (iii) engaged in numerous dialogues among counsel to the Debtors, Proposed Purchaser, other Noteholder Objectors. While it remains to be seen if BitTx does submit an offer for the Assets, the fact remains that they have been given all the tools and the time they requested time to do so.

15. Notwithstanding the likely mootness of the BitTx Objection, it is worth briefly addressing two other points raised therein. First, for the avoidance of doubt, the Debtors obviously deny the allegations raised in Section A of the BitTx Objection, including any accusations regarding fraudulent transfers and the analogous claims raised by way of their Proof of Claim. To the extent BitTx ultimately wishes to press and substantiate such claims (at present, there is no evidence offered to support any of them), the Debtors will address them at that time, but that has no bearing on the present sale of the Debtors' interests in the Assets.

16. Secondly, BitTx criticizes the process employed here (despite their modest delay request referenced above), at least in part by drawing parallels to the recent *In re iMedia Brands, Inc.* bench ruling rendered by Judge Owens. Namely, BitTx asserts that a sale of a debtor's assets outside of a plan "usually involves a two-step process, approval of bidding procedures followed by approval of the sale," whereas here, BitTx asserts that the Proposed Purchaser is seeking to short-circuit that process based on its funding commitment as the concurrent Debtors' DIP Lender. Neither of these points—to the extent BitTx is still pressing them at all—warrant denying the sale here. As an initial matter, the Debtors have provided ample evidence *supra* regarding the dire state of these companies, irrespective of any funding provided by the Proposed Purchaser; this is a point BitTx itself expressly acknowledges. *See* BitTx Objection, ¶ 38. Accordingly, the Debtors have attempted to be as flexible, transparent, and accommodating as possible to BitTx and other parties that purport to have an interest in the Assets, including the opportunity to conduct extensive due diligence, submit offers in excess of the Proposed Purchaser's offer, and participate in an auction. While BitTx remains free to take issue with the process employed here (despite having been kept apprised and included in discussions re the same), the reality is they had access to the time and information they requested here.

17. As to any direct comparisons between these cases and *iMedia*, quite simply, these cases are not *iMedia*. To begin with, BitTx itself admits that it is only the "usual" sale case that includes formal approved bid procedures, not all; the Code does not explicitly require them and even Judge Owens qualifies her *iMedia* ruling that excluding a Court-approved process was "not warranted ***by the facts presented here***." BitTx Objection, Exh. C, Transcript p. 32, lines 2:4 (emphasis added). More fundamentally, however, the facts underpinning the *iMedia* dispute are vastly inapposite to those here, including *inter alia*: (i) the *iMedia* cases involve exponentially

larger asset pools, employees, professionals, contracts, and inherent assets and liabilities, which according to those debtors' filings, amount to more than $500 to 600 million of assets and liabilities; (ii) the *iMedia* debtors apparently did not interface with case constituents about their decision-making, including the Unsecured Creditors Committee, regarding the timing or process for their sale; and (iii) the *iMedia* debtors sought to hold an auction four business days after notice of the same, while pressing to have the sale hearing on the very same day as that auction, mere hours later. None of those facts have parallels here, and in fact the opposite is true—i.e., (i) this is a small estate with eight employees and assets which are deteriorating (such as FIL lender relationships) the longer it goes on; (ii) the Debtors have interfaced with multiple parties in this case regarding process, including the U.S. Trustee, the Subchapter V Trustee, and the Noteholder Objectors; and (iii) the Sale Motion will have been served more than a month prior to the Sale Hearing. While not immediately clear, it seems *iMedia* likewise did not involve (as it does here) objecting parties that had years of participation with the Debtors prior to the bankruptcy cases, including extensive knowledge of the companies' distress leading into the bankruptcy filing.

18. Given the facts and circumstances of these cases, the BitTx Objection should be overruled.

C. *Hessler Joinder*

19. Much of the foregoing analysis applies with equal force to the Hessler Joinder. Indeed, much like the other Noteholder Objectors, Hessler is an individual with deep knowledge of the Debtors, their affiliates, and their principals. Sale Declaration, ¶ 16. The Hessler Joinder itself, of course, is not a stand-alone pleading, rather it "joins" the Amended AHNG Objection, a pleading which the Debtors believe was and remains procedurally improper *ab initio* (to say nothing of any potential Bankruptcy Rule 2019 violation attendant therewith). For the avoidance

of repetition, the same arguments the Debtors raise *supra* as to the procedural and substantive propriety of the Amended AHNG Objection are necessarily adopted here. The Debtors note that the Hessler Joinder is likewise untimely in its own right—a full five days after the Sale Motion's objection deadline—with ample evidence establishing Hessler received the Sale Motion timely on July 11, 2023. *See, e.g.*, Sale Motion Certificate of Service [D.I. 34].

20. In any event, much like BitTx, Hessler has also been engaged on a postpetition basis in these cases. Indeed, as mentioned at the Debtors' final DIP financing hearing the Court held on August 1st, 2023, the Debtors pledged and have since followed through on making sure Hessler had all information and data he requested in considering whether to submit a bid for the Debtors' assets. Hessler and the Debtors, both directly and via counsel, have had a number of productive discussions,[11] emails, and calls regarding Hessler's interest, in addition to the Debtors providing full access to their Data Room and arranging for visits to the Lightedge facilities where the Assets reside. In light of that, it is unclear at this point what legal objections remain, or at least those that have not already been addressed in this Reply. To the extent not moot, the Hessler Joinder should likewise be overruled in conjunction with the faulty pleadings it attaches itself to (the AHNG Objections).[12]

D. *Lightedge Objection*

21. As written, the Lightedge Objection "does not oppose the Debtors' effort to conduct a sale of assets in these cases." Lightedge Objection, ¶ 5. Instead, the Debtors understand that Lightedge asserts possessory liens under state law that it seeks to have ride through the sale. *Id.*

---

[11] These discussions have likewise included the Subchapter V Trustee from time to time.
[12] The Debtors will note that the Hessler Joinder raises a number of allegations which are entirely unsubstantiated with any evidence. For the avoidance of doubt, the Debtors dispute Hessler's allegations as written (especially ¶¶ 1-5) and believe that all of the Debtors' filings, evidence, and conduct to date establish the opposite conclusions. If or when evidence substantiating the Hessler Joinder's arguments is provided, the Debtors reserve all rights to contest it.

While the Debtors obviously disagree with the legal assertions in the Lightedge Objection and the purported legal bases given for any purported liens, the Debtors submit that such bona fide dispute need not be resolved prior to approving the sale. Likely by way of language in the proposed order approving the sale, the Debtors expect to negotiate (be it before or after the sale) a resolution to Lightedge's assertions of any liens. In the event the parties cannot reach consensus on the dispute, they will seek to have the same resolved in this Court or a court of comparable jurisdiction.

## II. THE SALE SHOULD BE APPROVED AS SECTION 363 IS SATISFIED

22. In conclusion, the sale of the Debtors' assets should be approved as a "sound business purpose" exists for the proposed transaction. *See In re Filene's Basement, LLC*, 2014 WL 1713416, at \*12 (Bankr. D. Del. Apr. 29, 2014) ("Transactions under § 363 must be based upon the sound business judgment of the debtor or trustee"); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Culp*, 545 B.R. 827, 844 (D. Del. 2016), *aff'd*, 681 F. App'x 140 (3d Cir. 2017); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (analyzing factors such as whether: adequate and reasonable notice of the sale was given to parties; the sale will produce a fair and reasonable price; the parties have acted in good faith). Here, the Debtors have determined, in their reasonable business judgment and after extensive efforts both before and after the Petition Date, that a sale of its Assets is the best and only way to maximize value for the Debtors' estates given the limited market for the same and the Debtors' concurrent liquidity crunch. Indeed, the Final DIP Declaration details the extensive prepetition efforts the Debtors made in this regard, *see* Final DIP Declaration ¶¶ 7-8, and the Sale Declaration details those taken since the Petition Date, including the pivot from a straight sale to the Proposed Purchaser, to a sale which incorporates an auction process if qualified bids received. *See* Sale Declaration; *see also* Original Declaration, ¶¶

11, 23, 41. Whether it be the Sale Motion as originally proposed or the competitive process going forward now, all of the Debtors' efforts have been an attempt to balance the precious little time, personnel, and funding the Debtors have with maximizing the value of the Debtors' assets and avoiding the value-deteriorating cost of a protracted Chapter 11 sale process.

23. In addition, the Debtors provided notice of the Sale Motion to all parties with a cognizable or historic interest in the companies; they established a price that, at a minimum, serves as a floor for the current process; the Proposed Purchaser too has proceeded in good faith—among other things, it has made itself available to the various bidders, moved DIP milestones to accommodate this process, and foregone any sort of standard bid protections. Beyond that, the Debtors have provided access to their Data Room upon execution of an NDA, responded to dozens of requests from various NDA parties seeking information, arranged for tours of the applicable facilities, and conducted itself at all times in constant communication with the Subchapter V Trustee. Under the circumstances, then, the Debtors believe the most equitable result possible will be achieved by the time of the Sale Hearing.

24. Finally, other than a potential shift in the acquirer, nothing has changed since the Sale Motion was filed with respect to sections 363(f) and (m). As to the former, the limited world of parties with potential liens are known to the Debtors and remain resolvable under the terms of the disjunctive provisions of Section 363(f). As to the latter, any asset purchase agreement executed through this process will have been negotiated at arm's-length by sophisticated parties, represented by their own advisors. The sale should be approved.

WHEREFORE, the Debtors respectfully request entry of an order overruling the Objections and/or addressing them as proposed herein and granting the relief requested in the Debtors' Sale Motion on a final basis.

Dated: August 14, 2023          BAYARD, P.A.
       Wilmington, Delaware

*/s/ Evan T. Miller*
Evan T. Miller (No. 5364)
Steven D. Adler (No. 6257)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: emiller@bayardlaw.com
       sadler@bayardlaw.com

*Counsel to the Debtors and
Debtors in Possession*