**UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FILE STORAGE PARTNERS, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11 (Subchapter V)<br><br>Case No. 23-10877 (CTG)<br>(Jointly Administered)<br><br>**Related D.I.: 8, 96** |

**DECLARATION OF TIMOTHY FUREY, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF THE DEBTORS' SALE MOTION**

I, Timothy Furey, hereby declare under penalty of perjury:

1. I am the Chief Restructuring Officer for File Storage Partners LLC ("FSP") and its affiliated debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases. In my capacity as Chief Restructuring Officer of the Debtors, I am familiar with the Debtors' day-to-day operations, books and records, business, and financial affairs. Likewise, I am familiar with and have overseen and approved the Debtors' actions detailed herein.

2. I submit this declaration (the "Sale Declaration") in support of the *Motion of Debtors for Entry of an Order (A) Approving the Sale of Substantially all Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [D.I. 8] (the "Sale Motion") and the *Debtors' Omnibus Reply in Support of the Sale Motion* [D.I. 96] (the "Reply") filed concurrently herewith.[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842). The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

[2] Capitalized terms otherwise undefined herein shall have the meanings ascribed to them in the Reply.

1

3.  As I have previously testified to in these cases,[3] the Debtors' decision to seek a sale of their assets through a bankruptcy forum did not come lightly, and certainly did not come without having exhausted every other option they had available to them.  Indeed, that reality was as true on a prepetition basis as it has been since the cases were filed.  The only distinction since the Petition Date is that more parties have surfaced with an interest in the Debtors' assets, even if some of those were the same parties that were approached prepetition.  While the level of interest has been a welcome surprise to the Debtors, it was nonetheless the intent behind serving the Debtors' sale papers on any and all of the investors in the various non-Debtor File Storage Ops and affiliated entities.

4.  As a result of the increased attention the Debtors have experienced since serving the Sale Motion on July 11, 2023, they have pivoted their approach to accommodate this change of circumstances while still attempting to comply with the limitations of the timeline and funding that they have available to them.  To name just a few examples of the efforts the Debtors have taken: (i) all interested parties that have surfaced since July 11th (the date that the Sale Motion was served) have been given the opportunity to sign an NDA and access the Debtors' data room ("Data Room"); (ii) the Debtors' professionals and personnel have engaged in dozens of video, telephonic, and email correspondences with such parties, to say nothing of orchestrating site visits to the two primary locations where the Debtors' assets reside; (iii) the Debtors hosted a "town hall" telephonic meeting on August 10, 2023, at which all parties subject to an NDA were invited to attend in order to gather further due diligence above and beyond anything previously asked; (iv) in consultation with the U.S. Trustee, Subchapter V Trustee, and the Noteholder Objectors, the Debtors pushed the Sale Hearing from what was originally August 1st all the way to August 17th

---

[3] *See* Original Declaration, First Supplemental Declaration, and Final DIP Declaration (collectively, my "Prior Declarations"), all of which I continue to adopt and incorporate herein.

in order to allow for further diligence and participation in an auction process (if needed) on August 16th; and (v) invited all such NDA parties to submit higher and better offers than the proposed purchaser in the Sale Motion ("Proposed Purchaser"), with said solicitation reflected, *inter alia*, through the issuance of sale notices docketed at D.I. 87 and 94 (the "Sale Notices"). As of the time of this Sale Declaration, it is my understanding that at least one interested party other than the Proposed Purchaser may submit such an offer by the August 15th deadline for doing so, in which case the Debtors are planning for a transcribed auction the following day (if no other offers are received, then no auction will be held). *See* Sale Notices. The Debtors anticipate notifying parties no later than the evening of August 16th as to the ultimate winning bid. *Id.*

5.  I maintain that given the facts, circumstances, and constraints of this particular case, all parties with a legitimate, realistic interest in the Debtors' assets had a fair and meaningful opportunity to participate. At bottom, the Noteholder Objectors have had the Sale Motion in hand since at least July 11th, nearly forty days prior to the Sale Hearing; I do not believe that any longer of a window would have generated any additional interest.

6.  As previously disclosed, I authorized service of the Sale Motion on an expansive list, including parties that previously served as investors in certain non-Debtor affiliate entities (such as the Noteholder Objectors). Since serving the Sale Motion, the Debtors received outreach from several parties who wished to gain more information on the Assets and/or conduct due diligence on the same for the purposes of potentially submitting a purchase offer. To accommodate that interest, the Debtors permitted them to access the Data Room (after signing a Non-Disclosure Agreement ("NDA")) that included information available to Proposed Purchaser, in addition to other relevant documents.[4] The Debtors also hosted a "Town Hall" style management presentation

---

[4] Among many other things, the Data Room has been populated with information regarding the purchase and acquisition of the Assets (including but not limited to a detailed spreadsheet and the upload of invoices comprising

3

on August 10, in which the Debtors' counsel and I addressed in a public forum (made available to NDA parties) various questions parties had as to due diligence and the sale process, to the best of my ability.[5]

7. In total, seven different entities signed NDAs, including Hessler and BitTx; the AHNG did not sign an NDA, although two of its members did in their individual capacity. In addition to the two Noteholder Objectors and the two AHNG members, the NDA parties consisted of two other parties in the Web3 space as well as one of the Debtors' former Filecoin lenders. In addition, at least one NDA party conducted a site visit at Lightedge's facilities, where the Assets reside.

8. As noted *supra*, mostly prior to undergoing the diligence process referenced above, the Debtors received the sale Objections. Below I address certain of the Objectors' assertions raised therein (to the extent that they have not already been addressed by my Prior Declarations).

I. SALE OBJECTIONS

A. *AHNG Objections*

9. I understand that the AHNG Objections claim that the Debtors' sale process (i) is too fast, (ii) does not consider the ability of other parties to participate in the process beyond the Proposed Purchaser, and (iii) does not allow for due diligence. On the first point, the Debtors have already extended the sale hearing from August 1st to August 17th, with closing scheduled for no later than August 31, 2023; this effectively means that the AHNG will have had nearly forty days since receiving the Sale Motion to convey any interest in the process, and nearly fifty-four days

---

the same), critical filings in these cases, as well as a "roadmap" document that directs parties where to find certain important, oft-requested pieces of information. The Debtors have continued to update the Data Room on a rolling basis as additional generic requests come in. As I also noted at the Town Hall meeting, the team that originally negotiated, acquired, and/or oversaw the purchase of the Assets are no longer with the companies and have not been since well prior to the Petition Date.

[5] In addition, on August 8, 2023, the U.S. Trustee conducted its 341 Meeting of the creditors, at which time I testified and answered questions raised by creditors attending the same (including some of the Noteholder Objectors).

by the time of closing. I believe this is more than sufficient time for parties to participate given the limited funding and size of these particular cases, especially considering the AHNG's knowledge of these companies' distress well prior to the Petition Date, as noted below and in my Prior Declarations.

10. As a practical matter, further extending the process beyond its current endpoint ignores several other realities of these cases—(i) the Debtors have experienced attrition to the already miniscule workforce that services the Debtors' operations, with two individuals having already resigned since the Petition Date; (ii) relatedly, the last funding for what personnel remains under the DIP Budget is for the week ending August 18, 2023—further delay risks the possibility that the remaining personnel will be uncompensated and significantly jeopardizes the likelihood that they continue in the Debtors' service at all; and (iii) the ongoing cases have caused other parties critical to the Debtors' operations to cease providing services, namely one of its Filecoin lenders, Darma Capital ("Darma")—Darma, on the argument that it is a federally regulated swaps dealer and thus excepted from the bounds of the automatic stay, summarily terminated its services to the Debtors earlier this month.[6] All this is to highlight the existential risks I believe these companies face the longer their proposed sale process remains unresolved.

11. Secondly, the Debtors have unquestionably encouraged and embraced the interest shown by other parties since the Sale Motion was served; indeed, one of the primary reasons for serving the Sale Motion on all investors in the non-Debtor affiliates was to provide transparency and make parties aware of the sale and these cases, despite the prepetition outreach we had already made. Since that time, the Debtors have spoken with, provided NDAs to, and otherwise assisted a number of such parties in their due diligence inquiries; it is my understanding that neither the

---

[6] Had the sale hearing proceeded on its initially scheduled track—August 1st— the impetus for this termination may not have presented itself or at least its impact mitigated.

AHNG itself nor its counsel has ever signed an NDA, although two of its members have individually done so. The Data Room made available to all NDA parties has been populated with dozens of documents, well beyond those that Proposed Purchaser had originally requested prepetition. Finally, it is my understanding that the Proposed Purchaser has made itself readily and openly available to the Noteholder Objectors, including directly reaching out to the same; said differently, I am not aware of any efforts to stonewall any sort of inquiries into the transaction.

12. Beyond that, the Debtors arranged for a process through which higher and better offers would be solicited and, if received, a virtual auction would be held. This process is reflected in the Sale Notices, which were served on all parties who received the Sale Motion as well as those who signed NDAs. *See* Sale Notices Certificates of Service, D.I. 93, 95. That process was further discussed at the "Town Hall" telephonic meeting hosted by the Debtors on August 10, 2023, which was made available to all parties that signed an NDA.[7]

13. The AHNG also asserts that the companies were not sufficiently marketed prepetition. Again, as set forth in my Final DIP Declaration, the Debtors in fact made extensive outreach to a host of different parties in trying to find a solution to their financial distress. This included exploring loans, equity investments, and outright sales of their equipment; perhaps more importantly, it involved dialogues with the Noteholder Objectors here. *See* Final DIP Declaration, ¶¶ 5-10. None of those options proved viable.

B. *BitTx Objection*

14. My understanding is that BitTx sought through the BitTx Objection an additional seven days to complete diligence to submit an offer. The Debtors have since provided that

---

[7] Despite not signing an NDA, the Debtors permitted counsel to the AHNG to attend this meeting, with all Debtors' rights reserved.

additional time. Moreover, BitTx, as an NDA party, has had full access to the Debtors' Data Room and sent and received numerous requests with the Debtors for information and disclosures.

15. In addition, to the extent BitTx still criticizes the process employed here or asserts that the Debtors are attempting to short-circuit any process, I reiterate and adopt the testimony I've given previously regarding the dire state of these companies, irrespective of any funding provided by the Proposed Purchaser. Accordingly, I believe the Debtors have been as flexible, transparent, and accommodating as possible to BitTx and other parties that purport to have an interest in the Assets, including the opportunity to conduct extensive due diligence, submit offers in excess of the Proposed Purchaser's offer, and participate in an auction.

C. *Hessler Joinder*

16. Much of my foregoing testimony applies with equal force to the Hessler Joinder. Indeed, much like the other Noteholder Objectors, Hessler is an individual with deep prepetition knowledge of the Debtors, their affiliates, and their principals. Hessler and/or his representatives have also been engaged on a postpetition basis in these cases since shortly after the Sale Motion was served. With respect to diligence requested, the Debtors have made every effort to ensure that Hessler and/or his representatives had all information and data he requested in considering whether to submit a bid for the Debtors' assets. Hessler and the Debtors, both directly and via counsel, have had a number of productive discussions,[8] emails, and calls regarding Hessler's interest, in addition to the Debtors providing full access to their Data Room and arranging for visits to the Lightedge facilities where the Assets reside.[9]

---

[8] These discussions have likewise included the Subchapter V Trustee from time to time.
[9] The Hessler Joinder also raises a number of allegations of wrongdoing (especially ¶¶ 1-5) which the Debtors believe are untrue and unsubstantiated. It is my belief that all of the Debtors' filings, testimony, and conduct to date establish the opposite conclusions.

7

## II. THE SALE SHOULD BE APPROVED

17. I believe the sale of the Debtors' assets should be approved as an exercise of the Debtors' business judgment. After strenuous efforts both before and after the Petition Date, the Debtors maintain that a sale of its Assets is the best and only way to maximize value for the Debtors' estates given the limited market for the same and the Debtors' concurrent liquidity crunch. Indeed, my Final DIP Declaration details the extensive prepetition efforts the Debtors made in this regard, *see* Final DIP Declaration ¶¶ 7-8, and this Declaration details those taken since the Petition Date, including the pivot from a straight sale to the Proposed Purchaser, to a sale which incorporates an auction process if qualified bids received. *See also* Original Declaration, ¶¶ 11, 23, 41. Whether it be the Sale Motion as originally proposed or the competitive process going forward now, all of the Debtors' efforts have been an attempt to balance the precious little time, personnel, and funding the Debtors have with maximizing the value of the Debtors' assets and avoiding the value-deteriorating cost of a protracted Chapter 11 sale process.

18. In addition, the Debtors provided notice of the Sale Motion to all parties with a cognizable or historic interest in the companies; they established a price that, at a minimum, serves as a floor for the current process; the Proposed Purchaser too has proceeded at all times in good faith—among other things, it has made itself available to the various bidders, moved DIP milestones to accommodate this process, and foregone any sort of standard bid protections. Beyond that, the Debtors have provided access to their Data Room upon execution of an NDA, responded to dozens of requests from various NDA parties seeking information, arranged for tours of the applicable facilities, and conducted itself at all times in constant communication with the Subchapter V Trustee. Under the circumstances, then, the Debtors believe the most equitable result possible will be achieved by the time of the Sale Hearing.

19. For all of the reasons stated herein, the Declarations, and in the Sale Motion and Reply, I believe the sale of the Debtors' Assets should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: August 14, 2023  */s/ Timothy Furey*  
Timothy Furey  
Chief Restructuring Officer for the Debtors